## WESSON v. UNITED STATES.

### No. 13771.

United States Court of Appeals
Eighth Circuit.

March 3, 1949.

Langdon R. Jones, of Kennett, Mo., and L. V. Rhine, of Paragould, Ark., for appellant.

G. D. Walker, Asst. U. S. Atty., of Little Rock, Ark. (James T. Gooch, U. S. Atty., of Little Rock, Ark., on the brief), for appellee.

Before GARDNER, Chief Judge, and RIDDICK and STONE, Circuit Judges.

GARDNER, Chief Judge.

Appellant, a physician practicing at Marmaduke, Arkansas, and the surrounding country, was charged with a violation of the Narcotic Law in an indictment containing four counts. Count 1 charged him with having made false and fictitious entries in his dispensing records and with having failed and omitted to show the dispensation of certain narcotics between the dates June 21, 1943 and May 10, 1945.

Count 2 of the indictment charged appellant with having sold, given away, bartered or exchanged, between the dates June 21, 1943 and May 10, 1945, 2,247 grains of morphine sulphate (cubes); 319 hypodermic tablets morphine sulphate, ¼ grain; and 76 fluid ounces tincture opium (containing 10% opium), all derivatives of opium, to divers persons unknown and in

quantities unknown, not in pursuance of a written order of the said divers persons issued for that purpose by the Secretary of the Treasury of the United States, not in good faith and not in the course of his professional practice, violating Section 2554, Title 26, U.S.C.A.

Count 3 of the indictment charged that appellant, between the dates of June 21, 1943 and May 10, 1945, obtained by means of order forms issued for that purpose by the Secretary of the Treasury of the United States, drugs mentioned in Section 2550(a), Title 26 U.S.C.A., for purposes other than the use, sale or distribution thereof by him in the conduct of a lawful business in said drugs or in the legitimate practice of his profession, violating Section 2554(g), Title 26, U.S.C.A.

Count 4 charged that appellant, on or about June 30, 1946, sold four hypodermic tablets of morphine sulphate, ¼ grain, to Joseph M. Buchanan, not in pursuance of a written order of said Joseph M. Buchanan on a form issued for that purpose by the Secretary of the Treasury of the United States, not in good faith and not in the course of his professional practice, violating Section 2554, Title 26, U.S.C.A.

Appellant will be referred to as defendant. The case has been twice tried. On the first trial defendant was acquitted on the first and fourth counts of the indictment and convicted on the second and third counts. On appeal the judgment of conviction was reversed for errors in the admission of evidence. Wesson v. United States, 8 Cir., 164 F.2d 50. On the second trial defendant was acquitted on count 3 but convicted on count 2. At the second trial, at the close of all the evidence offered by the government and again at the close of all the evidence in the cause, defendant interposed a motion for judgment of acquittal on count 2 of the indictment. This motion being denied, he renewed the motion within five days after the jury was discharged and this motion was likewise denied.

Defendant seeks reversal on the grounds, (1) that the court erred in overruling his motion for acquittal; (2) the court erred in including in its charge government's requested instruction No. 1; (3) the court

erred in permitting government's witness King to testify as to the special policy of Upjohn Company, without showing that defendant had knowledge of such policy, and erred in permitting government witness Schaefer to testify as to the general policy of the Narcotic Department; (4) the court erred in sending out to the jury certain government exhibits after the jury had been out several hours and in failing to give cautionary instructions as to the weight to be given such exhibits; (5) the court erred in reprimanding Dr. Lloyd in the presence of the jury.

In our view of the record the question of decisive importance is that which challenges the sufficiency of the evidence which was raised by the motion for acquittal interposed at the close of all the evidence.

To the defendant's contention that the evidence is insufficient to sustain the verdict, counsel for the government assert that this contention is precluded because, it is said, that this court on the former appeal held the evidence to be sufficient and that on the second trial the evidence on behalf of the government was substantially the same as on the former trial except for the matters which were held to be incompetent on the first appeal. This necessitates an examination of the record and briefs on the former appeal. It is, of course, only where the evidence on the second trial is substantially the same as that on the first trial that the rule of the law of the case is applicable. It is first observed that although on the first trial defendant was tried on four counts, on the second trial he was tried on only two counts. The printed transcript of the record in the first case contains only 147 pages, whereas the transcript of the printed record on the second trial contains 262 pages. The record on the first appeal contains no exhibits, while the record on the second appeal contains some 32 exhibits, some 13 of them being exhibits offered by the defendant and received in evidence. There were several witnesses who testified in the second trial who did not testify on the first trial.

On the first appeal defendant was represented by the same counsel who now represent him, and in their brief on the first appeal they admitted that, "There was a sharp conflict in testimony as to how much nar-

cotic had been accounted for by Appellant by his prescription record, and the testimony offered by the defendant and the pharmacist, Wade Baxter, who checked the doctor's prescription record."

On the present appeal not only is there no such admission by counsel for defendant, but they charge that, "There is no dispute or conflicting evidence in any material facts in this case. The government relied entirely upon circumstantial evidence to obtain the conviction of the appellant."

The diligence of counsel for the government has failed to point out wherein there is any dispute or conflict in the evidence. In the opinion on the first appeal it is stated that during the period covered by the indictment appellant was shown to have bought narcotics equivalent to a total of 45,708 ¼-grain doses of morphine sulphate, which would have enabled him to dispense or administer narcotics at that time equivalent to more than 69 ¼-grain doses of morphine sulphate per day. The evidence in the record now before us is undisputed that ¼-grain doses of morphine sulphate were administered by defendant largely hypodermically and that doses which were taken by mouth contained ½ grain. It also appears in the evidence now before us that at least 99% of the morphine sulphate administered by defendant was by mouth and it is said in defendant's brief in the present case that based upon the undisputed evidence, properly calculated the average number of doses per day dispensed by defendant but not necessarily used by the patient the same day, was 26 instead of 69. Counsel for the government do not dispute the correctness of this calculation but assert that there is no explanation why it was necessary to administer this number of doses. It also appears, which did not appear in the former case, that 75% of defendant's dispensation was morphine sulphate in cubes, which were used in the treatment of flu, severe colds, in his cough syrups and for other ailments. There was evidence in both trials that during the times charged in the indictment there were three flu epidemics in defendant's immediate locality.

 We are clear that the record is substantially different on this appeal from that presented on the former appeal. It is therefore necessary to consider the evidence for the purpose of determining whether it was of such substantial character as to prove the guilt of the defendant beyond a reasonable doubt. The evidence is entirely circumstantial. We have searched the record with great care and think there is not a syllable of direct evidence of a single unlawful exchange, barter or gift of narcotics by defendant. There is no evidence of a single transaction with any addict, nor is there any evidence that any addicts frequented defendant's office, nor that any of his patients were narcotic addicts. Before considering the nature of the circumstances relied upon it is well to have in mind the rule of law relative to the probative force of such evidence. Even in a conspiracy case, which is ordinarily not susceptible of proof by direct evidence, facts and circumstances to sustain a verdict must be such as legitimately tend to sustain an inference. Inferences must be based upon proven facts or facts of which judicial notice must be taken and one inference cannot be based upon another inference. To sustain a finding of fact the circumstances proven must lead to the conclusion with reasonable certainty and must be of such probative force as to create the basis for a legal inference and not mere suspicion. Circumstantial evidence, even in a civil case, is not sufficient to establish a conclusion where the circumstances are merely consistent with such conclusion or where they give equal support to inconsistent conclusions. Adair v. Reorganization Investment Co., 8 Cir., 125 F.2d 901; Southern R. Co. v. Stewart, 8 Cir., 119 F.2d 85; Hoskins v. United States, 8 Cir., 120 F.2d 464; Massachusetts Protective Ass'n v. Mouber, 8 Cir., 110 F.2d 203. In Read v. United States, 8 Cir., 42 F.2d 636, 638, which was a criminal case, this court, in an opinion by the late Judge Kenyon, said: "The law applicable to the first proposition (the question of the sufficiency of the evidence) is well settled in this circuit. In Salinger v. United States [8 Cir.] 23 F.2d 48, 52, this court said: 'Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt, it is the duty of the trial judge to in-

struct the jury to return a verdict for the accused, and, where all the evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse a judgment against the accused.' "

The government made proof of the purchase of narcotics and the use of the narcotics purchased by other physicians in the area in which defendant was practicing. It made proof of the quantity and kind of narcotics purchased by defendant during the period charged under the indictment. It made proof that three prescriptions written by defendant had been altered or changed after they had originally been written. As before observed, there was no evidence of any unlawful sales made by the defendant. Some confusion has, we think, been caused by the testimony with reference to the number of doses of narcotics embodied in the sales made by defendant. Defendant was a licensed dispensing physician. He filled his own prescriptions instead of writing prescriptions to be filled by druggists. The morphine sulphate was an ingredient of cough medicines which defendant prescribed for coughs, colds and for influenza. Confessedly, when a patient received a bottle of this cough medicine it had more than one dose in it; in fact, the prescriptions largely show that the medicine was to be taken at stated intervals so that the fact that there might have been 26 doses or even 60 doses, does not indicate that the quantity sold was to be immediately consumed, nor in fact that it was ever all consumed. It is certainly conceivable that defendant might in the regular course of his business have prescribed 26 or even 60 doses in one day and yet may not have treated more than a half dozen patients. The government produced certain physicians who were not dispensing doctors and hence, their prescriptions were filled in a drug store. Notwithstanding that, Dr. McClure testified that he purchased 1600 ¼-grain morphine and codeine tablets, but in addition to these he wrote prescriptions during this time and these were not added to the amount of narcotics which he in his practice used. This doctor used codeine with sulphate, rather than morphine but he testified that morphine sulphate is used in cough syrup but he preferred codeine; that there was noth-

ing wrong in the use of morphine sulphate except that the doctor thought it might be habit forming. A Dr. McGuire testified that he purchased 2050 ¼-grain morphine sulphate and codeine sulphate tablets during the time in question; that he gave morphine hypodermics at least two or three times each week; that he used codeine sulphate in his cough syrup instead of morphine sulphate but he did not dispense any narcotics except the narcotics which he personally administered hypodermically. His prescriptions for narcotics were filled by a drug store and hence, were not added to the amount used by him. He testified that morphine sulphate is used in cough syrup by some doctors; that some doctors use more morphine in their treatment of diseases than other doctors and that is the case with perfectly respectable doctors; that the practice of medicine is largely up to the doctor's judgment and there are differences in opinion as to the treatment of any affliction. Dr. Jones testified to the purchase of between 600 and 700 morphine sulphate ¼-grain tablets in a year but he was not a dispensing physician and the only narcotics purchased by him he administered himself hypodermically and kept no record. He testified that morphine sulphate is used by some doctors in their cough syrups instead of codeine and that he would consider them good reputable doctors. He testified that tincture of opium is used in the treatment of dysentery and diarrhea and for earache. Dr. Dishongh qualified as a narcotic specialist. He testified that ½ grain of morphine by mouth is equivalent to ¼ grain by hypodermic. He was not a dispensing doctor. Dr. Lloyd was a dispensing doctor. He came from a village with a population of 125, while the City of Marmaduke has a population of between 600 and 700. During the period in question he purchased 4500 ¼-grain morphine sulphate tablets and two gallons of Sedacoff containing 32 grains of morphine in a gallon; that in his opinion the average dose of morphine would be from ¼ to ½ grain; that his practice required about three hypodermics of morphine per day; that he dispensed considerable morphine because his patients lived far away and he would dispense it in capsule and powder form in

½-grain doses because it takes twice the amount by mouth as it does by hypodermic; that he used morphine sulphate in his cough syrup and would use 5 grains per 4 ounces, or about 1½ grains of morphine per ounce, but that for a severe cough he would use 5 and 6 grains in a 4 ounce bottle of cough syrup; that members of the medical profession differ in their opinion as to the treatment of the same ailment but that many reputable physicians prescribe morphine in their cough syrup and that he used it all together; that in twenty-seven years of practice he had had no bad effects from it and that he considered it a good cough remedy.

There was no dispute in the evidence as to the amount and kind of narcotics purchased by defendant. Defendant produced in open court all his narcotic prescriptions except those in possession of the government. The prescriptions had all been examined and inspected by government experts. These prescriptions indicate the kind of narcotics dispensed, the date of the prescription, name of the patient, the ailment of the patient, the amount of narcotics and directions for taking. The prescriptions were charged on a daily ledger, the ledger showing the date and amount of charge for the prescription. A number of these prescriptions are embodied in the printed transcript of the record. These prescriptions account for all of the narcotics shown to have been purchased by defendant during the time in question. His daily cash and charge ledger upon which he had entered charges day by day on the business that he had done was produced and he testified that this was the same record from which he made up his income tax returns for that period of time. Wade Baxter, a regularly licensed pharmacist, was a witness for the defendant and testified that he had checked all the prescriptions for the narcotics dispensed between September 10, 1943 and May 10, 1945, produced in court by the defendant, and those in possession of the government; that he made an aggregate of the total quantity of the drugs and also checked all the prescriptions written by defendant and gave the aggregate quantity over such period. In effect his testimony showed that all the narcotics purchased by the defendant were covered by these prescriptions and the prescriptions in turn were shown on defendant's daily ledger.

We have carefully checked the testimony of the defendant and his witness Baxter and are of the view that it is not only uncontradicted but unimpeached. There was, however, testimony with reference to alterations made in three prescriptions. Two of these were written by defendant for George Reynolds and one was written for Mrs. Charles White. A handwriting expert testified that each of these prescriptions had been added to after they had originally been written. There was no dispute as to the testimony of the handwriting expert as to the alterations and the alterations were admitted by defendant. Government's Exhibit 2 was a prescription dated November 1, 1944. Defendant testified that Mr. Reynolds had injured his face and was suffering from erysipelas which caused severe pain; that he diagnosed his trouble and prescribed for him; that he wrote a prescription for six capsules and prepared six capsules at his bedside; that at that time he put six ¼-grain tablets in the six capsules; that Mr. Reynold's son returned to Marmaduke with the defendant and that defendant then fixed more medicine for Mr. Reynolds and fixed more capsules; that he had only six capsules with him when he visited the Reynolds home but on his return to the office he fixed ten more capsules on the same date he examined Mr. Reynolds, and instead of writing a new prescription he put "X" on the left hand side of the "VI" already written on the original prescription; that he delivered the extra tablets on the same date he wrote the original prescription. As to the other prescription written for George Reynolds, government's Exhibit 1, he testified he had visited Reynolds at his home on the 10th or 11th of the month and that Reynolds had injured his knee, and that on the 12th of November his daughter came to defendant's office and said she could not keep her father in bed, that he was suffering and was out of rest medicine. Defendant then fixed six capsules containing ¼ grain of morphine and after writing the prescription he decided that he should fix more capsules and made a total of eighteen, and that instead of writ-

ing a new prescription he added these extra capsules to the original prescription he had already written; that it was his opinion that George Reynolds needed more medicine for his ailment at that time.

As to the third prescription, government's Exhibit 3, defendant testified that it was written for Mrs. Charles White on August 21, 1944; that he visited Mrs. White at her home for confinement on August 21; that on examination he found her suffering from dysentery and expected labor pains; that he fixed six capsules, placing ¼ grain morphine sulphate into each capsule and gave her some medicine; that he remained a while and gave her a second dose and then decided that it would be best to fix her more capsules for the reason that she lived eleven or twelve miles in the country; that he fixed a total of sixteen capsules, took the prescription home, and when he started to file it, added the "X" at the left of the "VI," making the prescription represent the amount he had actually left the patient; that he added the "X" the same day that he wrote the original prescription; that he had examined Mrs. White and diagnosed her trouble at the time he wrote the prescription and that in his opinion the medicine prescribed was what she needed for her ailment at that time.

■ George Reynolds was subpoenaed as a witness by the government and the subpoena was served on him but the government did not produce him as a witness, and defendant's testimony with reference to the manner in which the prescriptions were changed stood without dispute. Mrs. White lived near Marmaduke, as did also Mr. Reynold's son and daughter, all of whom, according to the testimony of the defendant, could to some extent, if defendant's testimony were untrue, have contradicted it. But the government did not produce any or either of these parties as witnesses. Defendant was clothed with the presumption of innocence and it was incumbent upon the government to prove his guilt beyond a reasonable doubt. The failure of the government, under the circumstances disclosed, to call these witnesses justifies, if it does not compel, the inference that their testimony would have been against the government. Aetna Casualty & Surety Co. v. Reliable Auto Tire Co., 8 Cir., 58 F.2d 100; Goldie v. Cox, 8 Cir., 130 F.2d 695; Donnelly Garment Co. v. Dubinsky, 8 Cir., 154 F.2d 38; Futrell v. Arkansas-Missouri Power Corporation, 8 Cir., 104 F.2d 752.

■ Defendant's testimony fully explains the only discrepancies that appeared in any of his prescriptions covering the entire time in controversy. The cases cited to support the government's theory here were cases in which the purchase and possession of extraordinary quantities of narcotics were unexplained. Certainly, the proven circumstances were as consistent with innocence as they were with guilt, and inferences may not be drawn from inferences. As said by us in Nations v. United States, 8 Cir., 52 F.2d 97, 105, in an opinion by Judge Stone: "Such double inferences are too remote to constitute evidence. As said by the Supreme Court in United States v. Ross, 92 U.S. 281, 283, 23 L.Ed. 707: 'They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain.'"

■ The circumstances as they stand out in the record are consistent with the direct, uncontradicted and unimpeached testimony of the defendant and his witness. Mere suspicion raised by the circumstances proved would not sustain a conviction, especially when such suspicion is removed by uncontradicted evidence.

It follows that the judgment must be reversed and the cause remanded to the trial court with directions to enter a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure, 18 U.S. C.A., relative to motions for acquittal.