UNITED STATES of America,
Appellee,

v.

John CIMINO and Joseph D'Ercole,
Appellants.

No. 360, Docket 28092.

United States Court of Appeals
Second Circuit.

Argued April 23, 1963.

Decided July 23, 1963.

James J. Hanrahan, New York City, for appellant Cimino.

Sabbatino & Todarelli, New York City, for appellant D'Ercole. Thomas J. Todarelli, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for United States. Jack D. Samuels and Arnold N. Enker, Asst. U. S. Attys., of counsel.

Before SWAN, WATERMAN and MOORE, Circuit Judges.

SWAN, Circuit Judge.

After trial before Judge Bryan, a jury having been waived, the defendants were convicted, and each was sentenced to imprisonment in a federal penitentiary for a period of 20 years on each count of the three count indictment, the sentences to run concurrently. Each defendant has appealed. Their appeals challenge the sufficiency of the evidence to support the convictions and raise several points of law requiring discussion.

In making its case the Government relied upon testimony of agents of the Federal Bureau of Narcotics. Neither defendant took the stand. The testimony of the Government witnesses is substantially undisputed as to the substantive offenses.

## A. THE SUBSTANTIVE COUNTS

■ Cimino's guilt of the two substantive offenses alleged in the indictment was so clearly established that a very brief statement of the testimony will suffice. In Brooklyn, on the morning of November 10, 1960, Cimino was introduced to Agent Avant by a "special employee" of the Federal Bureau of Narcotics by the name of Saul Scott, who was not produced as a witness. Cimino, Scott and Avant drove in the latter's automobile to Manhattan and on the way Avant began negotiations with Cimino for the purchase of a quarter kilo of heroin. Cimino said he would have to consult his source, Joe Z; he added that he could not fix a price, but that it would probably be between $3,600 and $4,200. Avant never saw Joe Z but other agents identified him as D'Ercole. Purchase of the heroin was completed in Manhattan between Avant and Cimino during the night of November 10. A second purchase of the same quantity of heroin, following a similar factual pattern, was completed between them on the night of November 22, 1960.

Whether the evidence as to D'Ercole was insufficient, as he argues, to support his conviction on the substantive counts, we need not determine because a holding of insufficiency would be of little avail to him if his conviction on the conspiracy count is sustained, since the sentence on this count was also 20 years. However, it may be noted that the Avant-Cimino-D'Ercole conversation discussed under the conspiracy count may well have been sufficient to establish that D'Ercole was in a position of control and hence, an imputed participant in the sales. Cf. United States v. Moia, 2 Cir., 251 F.2d 255.

## B. THE CONSPIRACY COUNT

Count 3 of the indictment charges that from January 18, 1960 to the date of filing the indictment [September 5, 1962] the defendants "and others to the Grand Jury unknown" unlawfully conspired to violate §§ 173 and 174 of Title 21 United States Code. The alleged overt acts were (1) that Cimino met with D'Ercole on November 10, 1960; (2) that on the same date Cimino "delivered a quantity of narcotics";[1] and (3) that on November 22, 1960 Cimino met with D'Ercole.

■ Witnesses for the prosecution proved the meetings between Cimino and D'Ercole on November 10 and 22 but no witness overheard their conversations or saw anything passed from one to the other. Their mere meeting was no evidence of their being conspirators; nor was Cimino's statement to Avant that Joe Z was "the source" of the heroin sold by Cimino competent evidence against D'Ercole. "Otherwise, hearsay would lift itself by it own bootstraps to the level of competent evidence." See Glasser v. United States, 315 U.S. 60, 74–76, 62 S.Ct. 457, 86 L.Ed. 680.

The evidence relied upon by the Government is an incident which occurred on December 7, 1960. At about noon on that date Avant and Cimino met at Benny's Luncheonette in Manhattan and negotiated for a third purchase which was never completed. Avant expressed a desire to meet Joe Z and Cimino suggested that he telephone Joe Z at LE 4–

1. The only delivery proved was to Agent Avant who purchased heroin from Cimino on that date and on November 22, 1960.

9197 at 3 o'clock that afternoon; Avant made the call and it was answered by Cimino whose voice Avant recognized. Avant then asked to speak with Joe Z and a different voice replied "This is Joe Z" and added "Give Johnny [Cimino] the money as you have done previously on your other two purchases. Everything will be all right. The quality and quantity of the stuff will be about the same. Later on we can meet and have dinner and discuss the price on future purchases." Agent Costa, who was surveilling the premises where LE 4–9197 was located, Gus' restaurant, testified that at about 3 P.M. on December 7, 1960, he saw Cimino enter the telephone booth. D'Ercole then entered the booth. When D'Ercole came out Cimino reentered the booth.

■ Judge Bryan convicted both defendants on the conspiracy count. In so doing it is obvious that he believed Avant's testimony as to what D'Ercole said on the telephone and Costa's testimony that D'Ercole was using the telephone at the time Avant talked with the voice which said "This is Joe Z." The Avant-Cimino-D'Ercole conversation was not hearsay. It was independent evidence—an admission from D'Ercole's own lips—of his complicity in the transactions on November 10 and 22. Although it is true as D'Ercole argues that the trial judge had to make certain deductions from the proof, nevertheless Costa actually saw D'Ercole enter the telephone booth when Cimino came out and saw Cimino re-enter after D'Ercole left. This was sufficient to establish D'Ercole as the owner of the voice. See United States v. Kahaner et al., 2 Cir., 317 F.2d 459 (April 25, 1963) footnote 4; 72 Harv.L.Rev. 920, 987.

### C. ALLEGED ERRORS OF LAW

■ Several of the points raised on the appeal are asserted by both appellants. The first of these poses an interesting problem of alleged conflict between the "Jencks Act," 18 U.S.C. § 3500, and the normal rule excluding evidence of a defendant's prior criminal record when he does not take the stand in his own defense or raise an issue as to his character. The problem arose early in the trial with respect to a document marked as Court's Exhibit 16 for Identification. This was a report made by Agent Costa, a witness for the prosecution, which the defendants asked to have produced under the Jencks Act. It contained *inter alia* a record of the defendants' prior criminal convictions. The trial judge read the Exhibit to determine its producibility under § 3500, and said that it contained matter which would have been grounds for a mistrial had it been called to the attention of a jury, but that he would not consider the non-evidentiary material but would decide the case "solely on the evidence." Each defendant then moved for a mistrial. Their motions were denied.

The appellants contend that the trial court's examination of the Exhibit was an error which entitles them to a new trial. This claim is premised on the notion that even in a non-jury case, any judge sitting as trier of the facts, cannot fail to be biased by knowing of a defendant's prior criminal record.[2] They suggest that such knowledge could have been avoided if the prosecutor had excised the prejudicial material before the Exhibit was handed to the judge for examination pursuant to § 3500. To require, or even to condone, selective disclosure to the court of statements requested under § 3500 would, in our opinion, run counter to the admonitions of this Court in United States v. Aviles, 2 Cir., 315 F.2d 186. Moreover, if it is to be presumed that a jury will pay no attention to evidence brought out and ordered stricken or to evidence which the jury is instructed to

---

2. Wigmore on Evidence § 194 appears to take this view, and was quoted to that effect by Cardozo, C. J., in People v. Zackowitz, 254 N.Y. 192, 198, 172 N.E. 466, 468. The quotation is dictum, since Zackowitz involved a jury trial; and in any event a New York decision would not be controlling on this court in the case at bar. Nevertheless, the appellants do pose a real problem: efficient administration of § 3500 must be balanced against potential prejudice to defendants in non-jury cases.

disregard, it is even more reasonable to trust a judge to ignore non-evidentiary matter. We hold that the motions for mistrial were properly denied.

 Appellants also urge that it was error to try them while the Government informer, Saul Scott, was unavailable as a witness; D'Ercole argues, in the alternative, that a continuance should have been granted to permit further search for Scott. No case of which we are aware has held that mere failure of production is reversible error, where diligent search for the special employee has been made. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639, requires only that the Government identify its informant; the duty does not extend to production, Williams v. United States, 9 Cir., 273 F.2d 781, 795–796, cert. denied 362 U.S. 951, 80 S.Ct. 862, 4 L.Ed.2d 868; Eberhart v. United States, 9 Cir., 262 F.2d 421, 422. There was no error in proceeding to trial without the missing witness. The granting of a continuance is a matter of discretion, see, e. g., Smith v. United States, 10 Cir., 273 F.2d 462, 466, cert. denied 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729. We see no abuse of discretion in denial of the continuance.

 Appellant Cimino contends that the indictment should have been dismissed for vagueness. The point is utterly without merit. See Brown v. United States, 9 Cir., 222 F.2d 293, 296, a prosecution brought under 173 and 174 of Title 21, where the court stated:

> " * * * where, as here, a statute creating an offense sets forth fully, directly, and expressly, all of the essential elements necessary to constitute the crime intended to be punished, it is sufficient if the indict-

ment charges the offense in substantially the words of the statute."

 Equally futile is Cimino's argument that the indictment was void because based on hearsay testimony of Agent Costa before the grand jury. No discussion is necessary. See United States v. Costello, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397.

Finally Cimino argues that Judge Bryan's general finding of guilt was insufficient. Rule 23(c) F.R.Crim.P. provides: "In a case tried without a jury the court shall make a general finding and shall in addition *on request* find the facts specially." (Emphasis added.) Cimino made no request for the special findings.

The judgments of conviction are affirmed.

WATERMAN, Circuit Judge (concurring in part and dissenting in part).

Although I concur in the affirmance of Cimino's conviction, the appeal of D'Ercole raises questions which are not, in my view, answered by the majority opinion.

The central question is whether there is sufficient evidence in the record before us to sustain D'Ercole's conviction on the conspiracy count in the indictment.[1] That question raises, in turn, the issue of whether the Government's failure to produce the government informer, Saul Sapp, alias Scott, as a potential defense witness at the time of trial, or to call Sapp as a government witness, should materially affect the consideration of the central question.

The events covered by the indictment occurred on three separate days in 1960: November 10, November 22, and December 7. On November 10, Sapp introduced

---

1. The majority opinion does not reach the issue of D'Ercole's guilt under the substantive counts of the indictment. Were it to do so, I submit that his conviction on these counts could not stand. The counts are based upon Avant's purchases of narcotics on November 10 and 22, 1962. On neither day were any conversations overheard between Cimino and D'Er-

cole; nor did any witness see D'Ercole in possession of narcotics or D'Ercole pass anything to Cimino. See *United States v. Jones*, 308 F.2d 26 (2 Cir. 1962); *United States v. Hernandez*, 290 F.2d 86 (2 Cir. 1961); *United States v. Santore*, 290 F.2d 51, 76 (2 Cir. 1960); and *Hernandez v. United States*, 300 F.2d 114 (9 Cir. 1962).

Narcotics Agent Myron Avant to appellant Cimino for the first time. During the course of negotiations with Avant about the purchase of a quarter kilo of heroin, Cimino stated that his source of supply was a person named "Josie" (or "Joe Z"). Later that day, before the delivery of the heroin to Avant, Cimino was twice seen talking to D'Ercole and the informer Sapp.

On November 22, Avant made a second purchase of heroin from Cimino. Again "Josie" was said by Cimino to be the source of supply and the person with whom he would have to make arrangements for delivery. Again Cimino and Sapp were seen engaged in conversations with D'Ercole.

On December 7, Avant began negotiations with Cimino for a third purchase of narcotics which was never completed. When Avant asked to meet "Josie," he was given a telephone number to call at three P.M. When Avant called at the appointed time, a voice which he recognized to be that of Cimino answered. After a brief conversation Agent Avant asked to speak to Josie. Thereafter a voice said "This is Josie. Give Johnny the money as you have done previously on your other two purchases. Everything will be all right. The quantity and quality of the stuff will be the same. Later on we can meet and have dinner and discuss the price on future purchases." Avant did not recognize the voice. The promised meeting never took place.

In order to establish D'Ercole's participation in the criminal conspiracy, therefore, the Government was required to rely exclusively upon the testimony of a second agent, David W. Costa, who testified that at approximately 3:00 P.M. on December 7, 1960, he was standing on the south side of 116th Street between First and Pleasant Avenues. He thereupon observed Cimino and D'Ercole enter Guss's Luncheonette on the north side of the street and walk to the rear of the building, where Cimino entered a phone booth. When Cimino came out of the booth, according to Agent Costa's testimony, D'Ercole entered, remained a few minutes, and came out. Cimino then returned to the phone booth for a few moments, and thereafter walked out of the luncheonette with D'Ercole. The Agent further testified that the number of the telephone in the booth which appellants entered was the same one which Agent Avant had been given for purposes of contacting "Josie".

Upon this testimony D'Ercole is found to be the mysterious "Josie," is convicted, and receives a 20-year prison sentence. Costa testified that he fixed the time when Cimino and D'Ercole were in Guss's Luncheonette as only "approximately" at 3 P.M. on December 7. Appellants' entry into the luncheonette and telephone booth could be significant, however, only if it occurred simultaneously with Avant's telephone call. Most of Costa's observations were made from the south side of 116th Street which, he testified, was approximately 60 feet wide between First and Pleasant Avenues. Costa, then, if he observed appellants' activities from the south side of 116th Street, had to observe them through the closed glass front door of the luncheonette, which was located on the north side of the street, while appellants were at the back of the luncheonette and, at least for a time, inside one of the two telephone booths.[2] Costa was, of course, unable to overhear any conversation either of the appellants may have had while in the telephone booth. Indeed, he could not determine whether they initiated or received any telephone call at all during the time they were there.

2. Upon cross-examination Costa stated, for the first time, that while appellants were in the luncheonette he crossed 116th Street, looked through the closed glass door for "five seconds at the most," then returned to his post on the south side of the street. No explanation was given as to which appellant was in a phone booth during this five second period, nor are we told which of the events, previously recounted on direct examination, occurred while Costa's back was to the luncheonette as he returned to the south side of the street.

The above constitutes the Government's evidence against D'Ercole, and, viewing it in its most favorable light, there remain limitations upon the accuracy of human observation [3] and upon the validity of inferences from circumstantial evidence which occur to me to be too perilous to be ignored when a twenty-year prison sentence is at stake.

The standard of appellate review is not, of course, the same as that to be applied by a trial judge. D'Ercole's conviction must be affirmed unless it was "clearly erroneous." Even by this generous standard, however, my brothers will agree, I believe, that, at best, the evidence supporting D'Ercole's guilt was marginal. Where my brothers and I may disagree is in the inference to be drawn, if any, from the Government's failure to produce, at the time of the trial below, or to call as a witness, Saul Sapp, the "special employee."

During the trial the Government maintained that although it was obliged to divulge the name of its informer, Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), it had no duty to produce him as a potential witness for the defense or "to place on the witness stand every person with some knowledge of the circumstances." The trial judge did not disagree with this interpretation of the government's obligations. Nevertheless, because of the evident importance of the informer's possible testimony, Judge Bryan repeatedly requested the Government to aid defense counsel in locating Sapp and granted several continuances for that purpose. The judge's repeated requests that the Government cooperate in this respect were consistent, I believe, with the spirit of Roviaro, though possibly not required by its letter.

Seldom can government informers be expected to be pillars of stability in their communities. If the common understanding is to be credited they are often narcotic addicts or petty criminals whose cooperation with law enforcement officials is not entirely voluntary. Under these circumstances, to give defendants the name (perhaps, as here, one of several aliases) of the Government's informer, without revealing the further information about the informer which the Government may be expected to possess, and without aiding defense counsel to find the potential witness, would only further expose the sharp disadvantages which a defendant often faces in preparing his defense to a criminal prosecution.

Concern with the debatable and debated extent of the Government's obligations under the Roviaro doctrine obscured at the trial below what, in my view, was the primary effect of the Government's failure to call Sapp as a witness for the prosecution.[4] That effect does not derive from Roviaro, but from a much older evidentiary rule, the rule concerned with the failure of a party to produce at trial evidence available to him.

3. When, during cross-examination, Agent Costa was questioned about occasional discrepancies between his testimony of events in 1960 and his "daily reports," made within a few days of the events, he readily conceded that the reports must be correct and the testimony wrong because he was testifying "nearly two years after" the events in question. Costa's reliance upon his reports rather than independent memory, however, raises the question whether the reports, themselves, were confined to the agent's personal observations. During his lengthy testimony before the Grand Jury, Costa answered many questions as if from personal observation. Upon cross-examination at trial, however, it was revealed that his testimony before the Grand Jury was based upon composite reports of the observations of various narcotics agents concerned with the case.

4. Exclusive attention to Roviaro may also explain the Government's contention that D'Ercole waived his objections with respect to the informer by failing to join with Cimino in demanding Sapp's presence at the trial. Although this failure may have worked a waiver of D'Ercole's rights under Roviaro, defendants in criminal cases need not object to the failure of the Government to establish a *prima facie* case against them prior to moving for acquittal for lack of having so established one.

The Narcotics Agents charged with the investigation of the case appear to have been doubtful, at least initially, concerning the sufficiency of their evidence against appellants. The events they testified to occurred in November and December of 1960. Cimino was not arrested until August of 1962, nearly two years later. D'Ercole was not arrested until sixteen days after the arrest of Cimino. During the intervening period Cimino was repeatedly urged to "cooperate with the Government," presumably in giving direct evidence to support the Government's circumstantial case against D'Ercole.

In light of these facts it is curious that no consideration appears to have been given by the Government to calling the government informer as a witness for the prosecution. Except for the defendants themselves, Sapp was the sole witness who could have given direct testimony of D'Ercole's guilt with respect to either the substantive or conspiracy counts of the indictment. According to the testimony of Agents Avant and Costa, Sapp was present during nearly every conversation between Cimino and D'Ercole on November 10 and November 22 when the sale of narcotics was allegedly being arranged or consummated. Testimony from Sapp (provided that it was confirmatory of the inferences which the prosecution sought to draw) would have transformed a case of questionable evidentiary sufficiency into a prosecution establishing D'Ercole's guilt beyond any peradventure of doubt.

Assuming that Sapp was within at least the "constructive" power of the Government to call as a witness, its failure to do so and its reliance upon testimony of less probative weight, raised a presumption that the informer's testimony would have been unfavorable to the Government's case. 2 Wigmore, Evidence §§ 285, 286 (1940 ed.) and the

many cases cited therein; United States v. Di Re, 332 U.S. 581, 593, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Wesson v. United States, 8 Cir., 172 F.2d 931, 936; Napper v. Rice, 127 W.Va. 157, 32 S.E.2d 41, 45 (1944); see United States v. Conforti, 200 F.2d 365 (7 Cir. 1953). Even if the conviction of D'Ercole was not clearly erroneous when based upon the marginal evidence of Agents Costa and Avant, provided that testimony had been the only available testimony, I submit that the conviction cannot withstand an unrebutted presumption that the testimony of the only non-defendant fully apprised of the facts in issue would have been unfavorable to the prosecution.[5] Whether D'Ercole's conviction may be affirmed turns, in my view, upon the question of whether Sapp was within the Government's power to the extent that it could call him as a witness at the trial below. It is to that question that I now turn.

The first identification of the government informer was secured by defense counsel in the course of his cross-examination of Agent Costa:

"Q. Now, who was this special employee you were assigned to? A. Saul Scott.

"Q. Is that his name, would you know? A. Yes.

"Q. What is his address?

* * * * * *

"A. I don't know his present address.

"Q. Did you know the address at that time? A. In November of—

"Q. In November of 1960. A. I didn't know his address at that time, no, sir."

By further cross-examination of Agent Costa, however, it was revealed that "Saul Scott" was an alias for Saul Sapp and that over a period of many months Sapp had been contacted by Costa at room 405 in the Manhattan Towers

---

5. Though not applicable here, there sometimes may be reasons, as discussed in this opinion infra, that would justify protection for "special employees," particularly in narcotics cases. Moreover, where

proof of guilt, even though circumstantial, is strong, (unlike this D'Ercole case) a faceless informer would not need to be produced as a government witness.

Hotel. Under lengthy cross-examination Costa further revealed that Sapp was present at the time of Cimino's arrest, and that Costa, presumably after the arrest and indictment of both appellants, had paid the informer $200 at "the end of the month of August or early September" of 1962. During September 1962, Costa again contacted Sapp at the Manhattan Towers Hotel; and in October, shortly before the trial below, Sapp attempted unsuccessfully to contact Costa at the latter's office.

Upon redirect examination by government counsel, Costa testified that he had made attempts to contact Sapp from the latter part of September until the time of trial, but that the informer could not be reached at the bars he previously had frequented and that he was "no longer at the Manhattan Towers Hotel." These efforts to locate the informer were made, Costa testified, at the request of government counsel "in case the defense wanted him as a witness at the trial." The record is silent, however, as to any attempts by Costa or other government agents, during their earlier contacts with Sapp, to advise the informer that his testimony would be needed or to insure his availability at the forthcoming trial.

Upon this showing it is too clear for doubt, I believe, that the Government did not at any time, including those periods when the informer was under its direct control, intend to call Sapp as a witness for the prosecution. The informer's name was absent from a list of suggested witnesses prepared by narcotics agents for the United States Attorney's office despite the fact that the agents were in continuous contact with Sapp at the time the list was prepared. The Assistant United States Attorney in charge of the case never spoke with Sapp and suggested that he be located, shortly before trial, only "in case the defense wanted him as a witness."

These facts, taken by themselves, raise the presumption that the testimony of the informer would have been unfavora-

ble to the Government's case. Moreover, that presumption gains some support from further events surrounding the search for Sapp that was reported to the judge as having been made during the course of the trial and prior to the sentencing of appellants.

After the cross-examination of Agent Costa, discussed above, Judge Bryan, on the morning of Friday, November 16, 1962, adjourned the trial until the following Monday with the request that the Government "give [defense counsel] such reasonable assistance as they can" in locating Sapp. On Monday an Assistant United States Attorney reported to the court that Agent Costa had sought to locate the informer on Friday and Saturday at the Manhattan Towers Hotel, and at known haunts elsewhere, but without success. Counsel for the defense then reported that upon simple inquiry at the Manhattan Towers Hotel it was learned that Sapp still resided in room 405, under the name "S. Fields." Upon voir dire examination, the hotel manager testified that Sapp first checked into the hotel on October 12, 1961, under the name of S. Scott; that the same person had lived in room 405, as S. Fields, since the beginning of 1962; that Sapp's room charge for 405 had been paid within the past week; and that two telephone calls from the room had been made on November 17, five days after the beginning of the trial below. Each of these assertions was supported by hotel records offered in evidence. Agent Costa was then examined by defense counsel and admitted that although he had gone to room 405 and knocked on the door during the weekend search he had left no message for the informer and had made no inquiries at the hotel concerning his whereabouts.

Whether these events reflect mere ineptitude on the part of the narcotics agents charged with finding the informer, or whether they demonstrate a disinterest or unwillingness to find him, cannot be determined on the record before us.[6] I am unable to believe, however,

6. The trial judge credited the government agents with good faith in making their

search. Because of his concern solely with defendants' right to know, under

that with the investigative facilities available to the Government in the Southern District of New York, this informer (who obligingly continued to live in an identified hotel room until at least five days after the commencement of the trial below) could not have been produced as a Government witness had the Government diligently sought to produce him. I conclude, therefore, that Sapp was under sufficient Government control during relevant periods so that failure to produce him, the witness best able to testify to D'Ercole's guilt or innocence, raised the presumption, not rebutted below, that the informer's testimony would have been unfavorable to the Government's cause.

It may be suggested that the Government's reluctance to produce informers in prosecutions such as this does not arise from a fear of what they will say as witnesses, but from a fear that they will be subjected to threats and reprisals by the defendants whose prosecutions they have facilitated. Roviaro commands, however, that here the informer's name be divulged to the defense; and, as here, defendants may be expected to connect the informer's name with a person with whom they have had dealings, whether those dealings were criminal or not. The subsequent physical production of the informer in the court room would seem to create no additional risks to those already existent.

It may further be suggested that a rule of evidence requiring the testimony of informers in criminal trials will adversely affect the entire informer system upon which the Government appears so heavily to rely in narcotics cases. I do not doubt that informers may be expected to resist any loss of the anonymity within which they operate. The evidentiary presumption which I believe to be applicable to this case, however, only arises in a limited few cases,—those cases where

the informer is quite obviously better able to testify to the facts in issue than are alternative Government witnesses. Moreover, the Government's alternative evidence may often be, as in the case of appellant Cimino, sufficiently strong to withstand any unfavorable inference created by a failure to call the informer.

I have great respect for the trial judge below. The record is replete with his efforts to assure to both defendants the fair trial that they were entitled to have under the rule that does not require the prosecution to produce in court every person having knowledge of the alleged criminal acts. Moreover, the record demonstrates that continuances were granted in order to apprehend Sapp and have him in court.

Nevertheless, for the reasons advanced above, I would reverse the conviction of D'Ercole and remand the case with instructions to hold D'Ercole's case upon the present record open for a further period of time, at least three months from the date of remand, within which the Government is to produce Saul Sapp so that he may testify and be examined under oath as to his knowledge of D'Ercole's alleged participation in the activities of November and December 1960. Should Sapp not be so produced, unless his production is prevented by believable circumstances superior to governmental power, or prevented by proven deliberate interferences by defendant, D'Ercole should be acquitted.

This unusual disposition, impossible in a jury case, but quite possible in a case heard by the court sitting without jury, seems to me to be required if justice is to be done both to the Government and to the defendant. The courtroom shyness of this particular special employee has been the subject of discussion by our court heretofore, see United States v. Glaze, 313 F.2d 757 (2 Cir. 1963), where

---

Roviaro, the identity of the informer, however, the judge drew no conclusion from the Government's failure to insure Sapp's availability for trial during the period he was unquestionably under its control.

Moreover, he viewed the Government's subsequent activities in searching for the informer as gratuitous government cooperation with defense counsel in locating a potential *defense* witness.

he appears under his alias of "Saul Scott," the designation adopted by my colleagues in the majority opinion. I believe it time to have this shyness overcome.