UNITED STATES of America,
Appellee,

v.

John J. HOULIHAN and Martin Legere,
Defendants-Appellants.

No. 228, Docket 28407.

United States Court of Appeals
Second Circuit.

Argued April 13, 1964.

Decided May 19, 1964.

Allen S. Stim, of Curran, Mahoney, Felix & Stim, New York City, for defendant-appellant Houlihan.

Charles C. Parlin, Jr., of Shearman & Sterling, New York City (Michael J. Aratingi and Thomas F. Ruhm, New York City, on the brief), for defendant-appellant Legere.

Robert J. McGuire, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., and Michael S. Fawer and Andrew T. Mc-Evoy, Jr., Asst. U. S. Attys., on the brief), for the United States.

Before WATERMAN, FRIENDLY and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Defendants, Houlihan and Legere, appeal judgments of conviction entered on a jury verdict finding them guilty on thirteen counts of mail fraud, 18 U.S.C. § 1341 (1958), wire fraud, 18 U.S.C. § 1343 (1958), and interstate transportation of stolen securities, 18 U.S.C. § 2314 (1958). On the first six counts, the mail and wire fraud counts, Houlihan and Legere were each given concurrent sentences of 3 and 1½ years imprisonment. On the remaining seven counts, sentence was suspended, and defendants were plac-

ed on probation for a period of three years to commence at the termination of the sentence imposed on the first six counts.

Houlihan contends that (1) the trial judge committed error in excusing a juror in the absence of defendants and their counsel, (2) the evidence was insufficient to support his conviction, (3) there was a fatal variance between the scheme to defraud alleged in the indictment and the proof adduced at the trial, and (4) a mistrial should have been declared because of the admission of prejudicial proof regarding motive, the antagonistic defense of a co-defendant, James R. Freeling, who was acquitted by the jury, and the inability of the jury to evaluate properly the evidence with regard to the individual defendants. Legere joins in Houlihan's first point and argues in addition that the trial court abused its discretion by (1) arbitrarily restricting Legere's examination of a government witness and (2) denying a continuance to permit the production of a witness sought by the defense. We find that no error was committed and affirm the judgments of conviction.

Each of the counts on which defendants were convicted involved a specific mailing, a specific use of telephone or telegraph or a specific interstate transportation of securities consummated in aid of a single scheme to defraud. This scheme was in essence a stratagem for purchasing a bank with the bank's own assets. Only O. Henry could do full justice to the plot. We attempt a brief sketch of its main outlines based on facts that might reasonably have been accepted as true by the jury.

. In June 1960, Freeling was president of the Capitol Hill State Bank in Oklahoma City, an apparently flourishing suburban savings bank. Houlihan was president of the Midwestern Security Corporation (hereafter "Midwestern Security"), a holding company, and its subsidiary, Midwestern Security Life Insurance Corporation (hereafter "Midwestern Life"). Midwestern Security and Mid-

western Life, whose principal offices were in Dallas, were experiencing financial difficulties. Houlihan was also a member of the Executive Committee and Chairman of the Board of the Grand Bahama Bank and Trust Company, Ltd. (hereafter "Grand Bahama Bank" or "Bahama Bank"). Legere was the President and a director of the Bahama Bank. The Government does not claim that the organization of the Bahama Bank in late 1959 and early 1960 was part of the scheme to defraud. At the time of the transactions related in the indictment, however, that bank's physical plant consisted of two empty rooms in a building in Freeport, Grand Bahamas, and its sole assets were less than $1000 in cash and 583,334 shares of stock in Midwestern Security, for which there was no ready market.

On July 1, 1960, Freeling obtained from the majority shareholders in the Capitol Hill State Bank an option to purchase their shares for a total amount of approximately $725,000. After several unsuccessful attempts to borrow the necessary capital, Freeling was eventually introduced to Houlihan and Legere by James W. Jackson, a loan broker.

Houlihan and Legere told Freeling that they were interested in acquiring a bank through which they could funnel business to the Bahama Bank. They asked Freeling how much cash deposit the Capitol Hill State Bank could make in the Bahama Bank if they were to lend Freeling the money that he needed to purchase the shares. Freeling told them that under the Oklahoma reserve requirements the Capitol Hill State Bank could probably deposit between $300,000 and $500,000 outside the state. Houlihan and Legere expressed little interest in making the loan because of the small size of the potential deposits.

The discussions continued the next day. At that time Legere told Freeling that the Bahama Bank was also interested in obtaining the bonds of the Capitol Hill State Bank for safekeeping as it would add to their prestige in the eyes of other

banks.[1] Houlihan then told Freeling that they were willing to make the loan if, as a result, the Bahama Bank could obtain a cash deposit of $300,000 to $400,000 from the Capitol Hill State Bank as well as the deposit of all of its bonds for safekeeping. Houlihan assured Freeling that arrangements had been made to perform the safekeeping function by redepositing the bonds in the Hanover Bank in New York City.

Further discussion resulted in an agreement that Houlihan would purchase the Capitol Hill shares but that Freeling would have an option for three years to buy the shares from Houlihan. A separate contract guaranteed Freeling six years employment with designated salary increases. Freeling then arranged with the selling shareholders for payment to be effected by a sight draft on the Hanover Bank in New York City accompanied by the stock certificates, which were to be surrendered on payment of the draft. On July 8, 1960, such a draft was forwarded to the Hanover Bank for collection.

Legere meanwhile was making the necessary preparations in New York.

On a number of occasions during the spring of 1960, Legere had spoken with John Andren, a Vice-President at the Hanover Bank in New York, about the formation of the Grand Bahama Bank and the possibility that Hanover might serve as a correspondent bank for the Grand Bahama Bank.

On July 11, 1960, Legere called Andren and told him that a draft in the amount of approximately $700,000 would be arriving at the Hanover Bank and that he, Legere, would put Hanover in funds to meet this draft.

Shortly afterwards Legere called Andren again and learned that the draft had arrived and required payment on presentment. Legere told Andren that he had expected three days to pay the draft. At Legere's request the Hanover Bank wired its Oklahoma City correspondent that Legere desired a three day extension. Houlihan explained to Freeling in Oklahoma City that his contact in the Hanover Bank was on vacation and Freeling received approval for the extension from the selling shareholders. Instructions were wired to the Hanover Bank extending the time for payment to July 14th.

On July 11, 1960, the date of these wires, the Hanover Bank had no funds on deposit in the name of Legere, Houlihan or the Grand Bahama Bank. In fact, it was not until July 13th that Legere opened an account at the Hanover Bank in the name of Grand Bahama Bank. At that time he told the Hanover officials that he expected a letter or package to arrive at Hanover for him and that it would provide a means of paying the outstanding draft.

That package, addressed to Legere as President of the Grand Bahama Bank, arrived at the Hanover Bank during the late afternoon of July 13th and contained approximately $500,000 in Government bonds and $173,000 in municipal bonds mailed to New York by the Capitol Hill State Bank for safekeeping pursuant to Freeling's understanding with Houlihan and Legere. These bonds had been collected during the afternoon of July 11th from other Oklahoma City banks, where they had been on deposit for safekeeping.

Upon receiving the package Legere inventoried the bonds. He complained about the inclusion of the municipal bonds, which could not be sold for immediate cash. The remaining bonds were insufficient to pay the $724,000 draft and complete the stock purchase. After a telephone conversation with someone in Oklahoma City, whom the jury could reasonably have concluded to be Houlihan, Legere told Hanover officials that additional securities would arrive in New York on the 15th. Legere directed Hanover's securities department to sell the $500,000 in Government bonds

---

1. Generally, smaller banks place their bond portfolios with larger banks in order to take advantage of the larger banks' facilities and greater experience. Safekeeping is simply a physical holding of the bonds without discretion to sell unless pursuant to the owner's order.

and to place the municipal bonds in a safekeeping account.

Houlihan called Freeling on the morning of July 14th and prevailed upon him immediately to wire $250,000 to the Grand Bahama account at Hanover and to forward the rest of the available bonds.

The $250,000 wire transfer arrived at the Hanover Bank on the afternoon of July 14th. Legere then authorized the Hanover Bank to pay the $724,000 draft out of the proceeds of the wire transfer and the sale of the Government bonds, thus consummating the purchase of the Capitol Hill State Bank.

When the second shipment of bonds reached New York thereafter, $550,000 in Government bonds were converted into cash and an additional $89,000 in bonds were deposited for safekeeping. At Legere's direction $460,000 was transferred to two banks in Dallas for the account of Midwestern Life and Midwestern Security, which subsequently used a portion of those funds to discharge certain outstanding obligations.

On July 25, 1960, the Federal Deposit Insurance Corporation, which was aware of the change of control and was concerned that something might be wrong with the bond account, commenced a special examination of the Capitol Hill State Bank. The Bank was closed by the State Bank Commissioner on July 29, 1960.

The first contention made by Houlihan and Legere is that the trial judge committed error in excusing a juror in the absence of defendants and their counsel. The juror, a practical nurse, had asked to be excused after the jury was sworn but before selection of the alternate jurors because her employer, a heart patient, objected to her serving on a two month trial. Judge Metzner denied the juror's request but informed her that she could renew it in the future if some emergency arose. Prior to the convening of court on the eighth day of trial the juror appeared at Judge Metzner's chambers. She explained that her pa-

tient had suffered extreme damage to the heart from an *angina* attack the previous day and was then alone at his home in the Bronx. Because of the emergency nature of the situation, Judge Metzner excused the juror without waiting for counsel. No transcript was taken of Judge Metzner's conversation with the juror, but counsel were fully informed upon their arrival.

The crux of the defendants' complaint is that the dismissal of a juror is an integral part of the trial and that its occurrence in the absence of defendants and their counsel violated the due process clause of the fifth amendment, the jury trial provision of the sixth amendment, and Rule 43 of the Federal Rules of Criminal Procedure, which directs that the defendants shall be present "at every stage of the trial including the impaneling of the jury * * *." See Shields v. United States, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927) (supplemental instruction in absence of defendants and counsel); Lewis v. United States, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892) (requiring defendant to make peremptory challenges without jurors present); Hopt v. Utah Territory, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884) (separate trial of challenges for cause in absence of court, defendants and counsel). Defendants do not argue that the decision to dismiss the juror was itself erroneous or that the substitution of an alternate, whose qualifications they had approved,[2] in any way affected the impartiality of the jury which tried them. See United States v. Puff, 211 F.2d 171, 184–185 (2d Cir.), cert. denied, 347 U.S. 963, 74 S.Ct. 713, 98 L.Ed. 1106 (1954); United States v. Goldberg (1964), 3d Cir., 330 F.2d 30; United States v. Zambito, 315 F.2d 266, 269 (4th Cir.), cert. denied, 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963). They do contend that a defendant who has been deprived of his right to be present at all stages of a trial has no additional burden of showing actual preju-

---

2. The defendants did not exhaust their peremptory challenges.

dice. Compare United States v. Neal, 320 F.2d 533 (3d Cir. 1963), and Evans v. United States, 284 F.2d 393 (6th Cir. 1960), with Walker v. United States, 322 F.2d 434, 436 (D.C.Cir. 1963), cert. denied, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed. 2d 421 (1964), and Jones v. United States, 299 F.2d 661 (10th Cir.), cert. denied, 371 U.S. 864, 83 S.Ct. 123, 9 L.Ed. 2d 101 (1962).

We conclude that defendants' rights were not violated. This circuit has previously held that it was not improper near the end of a trial for a judge to speak privately and off the record to a juror to convince him to remain on the jury after he had requested to be excused for reasons of personal hardship. United States v. Woodner, 317 F.2d 649, 652 (2d Cir.), cert. denied, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963). As we said there,

> "we would hesitate to presume that prejudice resulted in the absence of some plain showing to that effect. * * * We have enough confidence in the integrity and fairness of the District Judges to assume that they will not make unfair remarks to jurors while undertaking administrative duties of this nature."

Accord, United States v. Zambito, supra; Bacino v. United States, 316 F.2d 11, 13–14 (10th Cir.), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963). Certainly no greater prejudice can arise when as a result of the interview the juror is dismissed and, in the presence of the defendant and his attorney, an alternate is substituted. The Woodner decision is therefore controlling unless it is to be distinguished on the ground that counsel and defendants were not given an opportunity to be heard prior to the juror's being excused.

Although every effort should be made to afford such an opportunity, we do not think that failure to do so in a case such as this presents grounds for reversal. Situations may sometimes arise when a respect for the rights of jurors will require the judge to take immediate action without consulting counsel—e. g., if a juror is taken so ill that he cannot come to court or has a family emergency requiring him to leave during the night or over a weekend. We hold that no error was committed by the trial judge in excusing the juror prior to the arrival of defendants and their counsel.

Houlihan's second contention is that the trial court improperly denied the motions for acquittal that he made at the end of the prosecutions' case and at the end of the trial on the ground of the insufficiency of the evidence to sustain a conviction.

One of the issues mooted in the briefs with regard to this contention is whether Houlihan's statement at the close of the trial that he rested on the evidence produced by the prosecution and the defendant Freeling constituted a waiver of the motion for acquittal at the close of the government's case. Cf. Cephus v. United States, 324 F.2d 893 (D.C.Cir. 1963). We do not decide that issue since we conclude that even under the view most favorable to Houlihan, i. e. that the sufficiency of the evidence must be determined solely on the basis of the evidence introduced by the Government, the motions for acquittal were properly denied.

In order to prove Houlihan guilty as charged, it was necessary for the Government to show that a scheme to defraud the Capitol Hill State Bank existed and that Houlihan knowingly participated in that scheme. The Government was also required to prove that Houlihan caused the mailings, the use of the telegraph and telephone, and the interstate transportation of securities charged in the indictment. It was not necessary, however, to establish that Houlihan directly participated in any of the mailings, use of the wires, or interstate transportation. It was sufficient if they were the foreseeable result of Houlihan's acts. Pereira v. United States, 347 U.S. 1, 8–10, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Moreover as the sentences on the first six counts were concurrent and

the sentences on the last seven counts were also concurrent, Houlihan's conviction must be upheld if the Government sustained its burden as to any one of the first six counts and any one of the last seven counts. Lawn v. United States, 355 U.S. 339, 359, 362, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958); United States v. Benjamin, 328 F.2d 854 (2d Cir. 1964).

The Government introduced proof to show that Houlihan had a motive, because of his financial difficulties, to participate in the fraud and that he benefited from the fraud through the transfers to Midwestern Life and Midwestern Security. It was Houlihan who contracted to purchase the controlling shares of Capitol Hill State Bank, and there was no evidence that Houlihan had any means of meeting that obligation other than with the assets of the Capitol Hill State Bank that were actually used for that purpose. A record of the long distance phone calls made by Houlihan while he was in Oklahoma City established that Houlihan was in frequent communication with Legere during the latter's activities in New York. Houlihan called Legere twice on the morning of July 14th, and, as previously noted, the jury could reasonably have inferred that it was Houlihan to whom Legere complained when the bonds in the first package turned out to be insufficient to cover the $724,000 draft. The cashier of the Capitol Hill State Bank who actually mailed the two packages of bonds testified that, at Freeling's direction, he called Houlihan after the second package was mailed and informed him that the additional bonds and the $250,000 wire draft had been sent to New York. Eighteen minutes later Houlihan again called Legere in New York.

From this evidence the jury could reasonably have concluded that Houlihan knew the wire draft would be used to pay off the $724,000 draft and thus that he was a participant in a conspiracy to defraud. The jury could also have found that on July 14th Houlihan caused the interstate wire transfer of $250,000 and the interstate transportation of $639,000

of securities known to have been fraudulently acquired, and was thus guilty of the counts in the indictment—four, eight, and nine—that refer to those transactions.

We therefore hold that the motions for acquittal were properly denied.

Houlihan's final contentions are that there was a fatal variance between the scheme to defraud charged in the indictment and that proved at the trial and that a mistrial should have been declared because of the admission of prejudicial proof regarding motive, Freeling's antagonistic defense, and the inability of the jury to separately evaluate the proof with regard to the individual defendants.

The points regarding the variance and the admission of prejudicial proof of motive are related. The indictment charges that Houlihan, Legere, and Freeling entered into a scheme to defraud commencing on or about January 1, 1960, which scheme continued up to the date of trial. The evidence produced at trial, however, showed that defendants did not even meet Freeling until the beginning of July, 1960. Houlihan contends that this was a fatal variance and that the only purpose of alleging the earlier date in the indictment was to permit the introduction of prejudicial evidence regarding the financial problems of Midwestern Life and Midwestern Security and certain manipulations of the asset accounts of those corporations carried out by Houlihan and Legere, possibly in violation of state law.

We hold that no error was committed. As the trial judge correctly charged the jury, it was sufficient if the scheme to defraud proved at the trial fell within the period charged. United States v. Postma, 242 F.2d 488 (2d Cir.), cert. denied, 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957). The law requires only "that a party charged shall be told the facts fully enough, and in sufficient season, to enable him to present his defence." United States v. Fried, 149 F.2d 1011, 1012 (2d Cir.), cert. denied, 326 U.S. 756, 66 S.Ct. 97, 90 L.Ed. 454 (1945). The jury was specifically

instructed that the evidence of financial embarrassment and the transactions involving Midwestern Life and Midwestern Security was admitted only to prove motive. It was clearly admissible for that purpose, 2 Wigmore, Evidence § 392 at 342 (2d ed. 1940), even though it might incidentally show the commission of another crime, United States v. Crosby, 294 F.2d 928, 946 (2d Cir. 1961), cert. denied, sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); United States v. Johnson, 254 F.2d 175 (2d Cir.), appeal dismissed, 357 U.S. 933, 78 S.Ct. 1378, 2 L.Ed.2d 1369 (1958).

▆▆▆ Houlihan's other points are entirely without merit. It was not error to try these defendants together even though Freeling, in testifying, may have verified some critical portions of the Government's case. See United States v. Caron, 266 F.2d 49, 51 (2d Cir. 1959); United States v. Soto, 256 F.2d 729, 735 (7th Cir. 1958). Nor can Houlihan properly claim prejudice because the jury may have found it difficult to relate the different items of proof to the particular defendant against whom they were admitted. This problem not infrequently arises in cases dealing with complicated financial transactions, and it is clearly established that a defendant's rights will be deemed to have been adequately protected if appropriate cautionary instructions are given, as was done here. United States v. Manfredi, 275 F.2d 588, 593 (2d Cir.), cert. denied, 363 U.S. 828, 80 S.Ct. 1598, 4 L.Ed.2d 1523 (1960).

▆▆▆ Defendant Legere complains of the failure of the trial court to grant a continuance for the purpose of permitting Legere to locate and to subpoena James W. Jackson, who was a potential witness. A request for a continuance, however, is addressed to the discretion of the trial court, and its denial will not be disturbed unless a clear abuse is shown. United States v. Cimino, 321 F.2d 509, 512 (2d Cir. 1963), cert. denied, D'Ercole v. United States, 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416; Cimino v. United States, 375 U.S. 974, 84 S.Ct. 491, 11

L.Ed.2d 418 (1964); United States v. Bentvena, 319 F.2d 916, 934–935 (2d Cir. 1963), cert. denied, sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1964). Although counsel was assigned for Legere in September, 1961, it was not until March 28, 1963, more than six weeks after the prosecution rested its direct case, that Legere caused a subpoena for Jackson to issue. As Legere's belated attempt to find Jackson was insufficient to demonstrate due diligence, it was not an abuse of discretion to deny the motion for a continuance. See United States v. Holiday, 319 F.2d 775 (2d Cir. 1963); Bandy v. United States, 296 F.2d 882 (8th Cir. 1961), cert. denied, 369 U.S. 831, 82 S.Ct. 849, 7 L.Ed.2d 796 (1962).

▆▆▆ Legere also contends that the trial court improperly precluded cross-examination of government witness Alonzo Canaday, one of the field examiners for the Federal Deposit Insurance Corporation who conducted the examination at the Capitol Hill State Bank beginning July 25, 1960, concerning his activities after July 27, 1960. Legere complains that the court's rulings prevented him from interrogating Canaday regarding his involvement in the prosecution's preparation of the case and consequent possible bias. An examination of the record reveals no error in the court's handling of this matter. United States v. Dardi (1964), 2d Cir., 330 F.2d 316; United States v. Bentvena, supra 319 F.2d at 940–941. Moreover, pursuant to Legere's request, the trial judge directed the prosecutor to hold Canaday available as a possible defense witness. Under such circumstances the court's ruling was well within the bounds of its broad discretion to control the scope of cross-examination.

As we find no merit in any of the defendants' contentions, we affirm the convictions.

The Court expresses its thanks to Charles C. Parlin, Jr., assigned counsel for Martin Legere, for his devoted attention to the interests of his client.