UNITED STATES of America, Appellee,

v.

Michael A. RUSH, Appellant.

No. 889, Docket 80–1446.

United States Court of Appeals,
Second Circuit.

Argued March 3, 1981.

Decided March 20, 1981.

Rehearing and Rehearing In Banc
Denied April 27, 1982.

Peter A. Clark, Asst. U. S. Atty., New Haven, Conn. (Richard Blumenthal, U. S. Atty., and Holly B. Fitzsimmons, Asst. U. S. Atty., New Haven, Conn., on the brief) for appellee.

S. M. Chris Franzblau, Newark, N. J. (Franzblau & Falkin, Newark, N. J., on the brief), for appellant.

Before FRIENDLY, MULLIGAN and TIMBERS, Circuit Judges.

PER CURIAM:

Appellant Michael Rush was charged with a single count of conspiracy to import marijuana into the United States with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) (1976). He was tried before T. F. Gilroy Daly, *District Judge*, and a jury. The jury returned a verdict of guilty. From the judgment entered thereon, appellant has taken this appeal. We affirm.

## I.

The government claimed, and the jury found, that appellant, a medical doctor, lent a total of $25,000 in two transactions to his co-conspirators to finance the purchases of marijuana from sources in the Bahamas. Appellant's co-conspirators repaid the principal amount of the loan and $15,000 in interest. The proceeds of the loan were used to import marijuana on at least three occasions. The marijuana was distributed in Florida.

Appellant contended at trial that, at the time he made the loan, he had no knowledge of the use to which the loan proceeds were to be put. On appeal, appellant conceded that he had such knowledge, but asserted three further contentions. The questions before us on appeal are (1) whether, even assuming there was probative evidence of appellant's guilty knowledge, he properly could be found to have become a "part" of the conspiracy; (2) whether the jury instructions were proper; and (3) whether the district court erred in refusing to give an alternate reading of the trial transcript to the jury or in refusing to disclose to the jury that there was a question as to the accuracy of the transcript. We shall discuss each of these questions in turn.

## II.

Appellant's argument that he could not be convicted even though he was "fully aware of the scope and object of the conspiracy" is neither novel nor compelling.

Appellant argues that he never became a "part" of the conspiracy because, under the conspiratorial agreement, he was not to share in the proceeds of the unlawful venture and because his loans to the co-conspirators were fully secured. These facts are said to establish that appellant had only the intent of a lender to profit from a loan transaction and lacked the intent of a criminal to enter into or to effectuate an agreement to violate the laws of the United States. In support of this analysis, appellant relies upon *United States v. Falcone,*

109 F.2d 579 (2 Cir. 1940) (L. Hand, J.), *aff'd,* 311 U.S. 205 (1941). The Court held in *Falcone* that a jobber in the sugar trade could not be found guilty of conspiring to manufacture illegal liquor merely because he knew that the wholesaler to whom he sold the sugar in turn would deliver it to illegal distillers. This Court on several occasions has stressed that *Falcone* should be limited "to its strict facts—the case of a supplier of goods, innocent in themselves, who does nothing but sell those goods to a purchaser who, to the supplier's knowledge, intends to and does use them in the furtherance of an illegal conspiracy." *United States v. Tramaglino,* 197 F.2d 928, 930 (2 Cir.), *cert. denied,* 344 U.S. 864 (1952); *see United States v. Piampiano,* 271 F.2d 273, 274–75 (2 Cir. 1959). *See also Direct Sales Co. v. United States,* 319 U.S. 703, 711, 713 (1943).

*Falcone* is not relevant here at all. Rush was not a supplier of goods or commodities which were to be utilized in an illegal venture; he supplied the cash which made the illegal venture possible.[1] Rush was a podiatrist and a partner of one Leroy Myers in the Emerald Hills Flying Service. He was not a money lender. He became one only to finance this venture at an exorbitant and usurious profit, knowing full well the source of the proceeds. He acted in a secretive and clandestine fashion, obtaining first a mortgage note reflecting a 10% rate of interest. That note was recorded. A second mortgage note for $10,000 required payment of $20,000 in five days. For obvious reasons that note was never filed. In *United States v. Piampiano, supra,* a fruit and vegetable dealer departed from his usual business to supply sugar to an illicit distillery. This Court found *Falcone* inapplicable since the defendant deviated from his usual line of business to deal in a commodity almost entirely new to him in a manner inconsistent with his previous business transactions. *United States v. Piampiano, supra,* 271 F.2d at 274. Rush here embarked upon a new line of business not

---

1. Money furnished to facilitate violations of the federal narcotics laws becomes forfeit to the United States. 21 U.S.C. § 881(a)(6) (1976).

only with full knowledge of its illicit nature but through a clandestine method devised to protect him from its consequences.[2]

We hold that there was sufficient evidence from which a properly instructed jury could find that appellant knew the borrowers' "intended illegal use", *Direct Sales Co. v. United States, supra,* 319 U.S. at 711 and that by making the loans he "intend[ed] to further, promote and cooperate in" their scheme. *Id.* "This intent, when given effect by an overt act, is the gist of conspiracy." *Id.* Appellant's attempt to distinguish the instant case on the ground that he had no "stake" in the illegal enterprise is unpersuasive. The role of appellant here and that of Direct Sales Co. were equivalent in their encouragement of illegal activity on the part of those with whom they dealt.

### III.

■ Appellant further claims that the district court committed reversible error in refusing to charge the jury in accordance with appellant's proposed instruction. That charge would have required the jury to apply the "stake in the interest" test set forth in *United States v. Falcone, supra,* 109 F.2d at 581, to determine whether appellant was a participant in the conspiracy.

Although the trial court is not required to use the "stake" language, *United States v. Salcido-Medina,* 483 F.2d 162, 164–65 (9 Cir.), *cert. denied,* 414 U.S. 1070 (1973), the court should instruct the jury that, in order to convict, it must find that the defendant intended to further or promote the illicit scheme.[3] Here, the district court's charge, although colloquial, did contain the necessary elements: agreement, common objective, some act in furtherance of the objective, and knowledge. We hold that the instruction was adequate and comprehensible to the jury. We do wish to emphasize once again, however, the importance in this critical area of adhering to judicially approved charges that are carefully drawn to aid the jury in focusing on critical issues.[4]

### IV.

■ The final claim on appeal concerns the reading to the jury of a portion of the trial transcript. When the jury first requested that portions of testimony be read, the judge brought the parties, their counsel, and the court reporter into his chambers to review the portions to be read. The reporter read a statement of one of the co-conspirators recalling a conversation with another co-conspirator about drugs as "... I don't remember exactly *whether* we said it ...." (emphasis added). The next day the judge informed defense counsel, out of hearing of the jury, that the court reporter had misread his notes and that the correct words were "... I don't remember exactly *when* we said it ...." (emphasis added). Over objection, the record was read to the jury in its corrected form. The judge refused to instruct the jury that a difference had arisen and that the jury should rely on its own recollection.

We reject appellant's attempt to raise to the level of reversible error the trial judge's decision, after consultation with the court reporter and defense counsel, to follow the reporter's unequivocal interpretation of his own notes. "The transcript in any case certified by the reporter shall be deemed prima facie a correct statement of the testi-

---

2. The surreptitious nature of the loans was evidenced not only by Rush's omission to record the usurious mortgage note but also by his method of withdrawal and replenishment from his bank account. He withdrew a total of $20,-000 net to finance the loans, and, although his profits amounted to $40,000, he redeposited only $10,000 so as to show no additional income.

3. *See, e. g., Direct Sales Co. v. United States,* 319 U.S. 703, 711 (1943); *United States v. Provenzano,* 615 F.2d 37, 45 (2 Cir.), *cert. denied,* 446 U.S. 953 (1980); *United States v. Guillette,* 547 F.2d 743, 750–51 (2 Cir.), *cert. denied,* 434 U.S. 839 (1976); *United States v. Cirillo,* 499

F.2d 872, 883 (2 Cir.), *cert. denied,* 419 U.S. 1056 (1974); and Model Penal Code § 5.03 (Tent. Draft No. 10, 1960).

4. *Peymann v. Perini Corp.,* 507 F.2d 1318, 1324 n.2 (1 Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975); *United States v. Montijo,* 424 F.2d 207, 208 (1 Cir.), *cert. denied,* 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970); *McMillen v. United States,* 386 F.2d 29, 32 (1 Cir. 1967), *cert. denied,* 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968); *Schlinsky v. United States,* 379 U.S. 735, 740 n.3 (1 Cir.), *cert. denied,* 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967).

mony taken and proceedings had," 28 U.S.C. § 753(b) (1976). It is plain that error may occur in compiling a transcript no matter how expert or experienced the reporter. In that instance it is appropriate for him to review the tapes and determine if indeed they were mistranscribed. When as here the judge and opposing counsel are apprised of the situation, the determination of the judge on this question of fact normally should terminate the issue.

In any event, we cannot agree with our dissenting brother that this testimony was that crucial. There was ample other testimony on the direct examination of both Hall and Myers that Rush was aware of the illegal purpose for which the money was to be used—"the doper business". There also was testimony that Mrs. Rush was upset and was anxious that her husband withdraw from the venture. Moreover, Rush's unsuccessful attempt to masquerade his participation as a legitimate business transaction utilizing mortgage notes prepared by his cousin, a lawyer, emphasized his effort to escape liability and thus his guilty knowledge. In fact in his reply brief Rush concedes that he knew the money was to be utilized for the purpose of purchasing marijuana in the Bahamas.

In fact, had the word used by Hall on direct been "whether" rather than "when," it is not understandable why counsel for the appellant would not have seized upon the issue on cross examination. He did not. The main thrust of Hall's cross examination was his motivation for testifying in view of his cooperation with the government. It is further significant that the disputed testimony referred to a conversation which took place *after* the first successful trip to the Bahamas. Since there was undisputed testimony that Rush knew the purpose of the loan *prior* to the trip, whether or not the issue again was discussed, is not crucial to the government's case. Hall did testify that prior to the loan he told Rush that the money was to be used to purchase marijuana. He also testified that after Hall's arrest Rush and he had agreed that Hall would falsely tell the authorities that $40,000 was borrowed to purchase a diesel truck, thus furnishing more proof of appellant's awareness.

We find that the evidence fully supports the conviction and that there was no reversible error. The mandate shall issue forthwith.

Affirmed.

FRIENDLY, Circuit Judge, dissenting:

In my view affirmance of this conviction is not a proper exercise of the power, conferred upon us by 28 U.S.C. § 2106, to "require such further proceedings to be had as may be just under the circumstances."

From the outset of this two and a half day trial the crucial question was whether Dr. Rush had supplied money to the others named in the indictment merely for the sake of making an exorbitant return or whether he had done so with the purpose and intent of enabling them to smuggle marijuana into the United States and thereby realize the profits needed to make the exorbitant return possible. It was not enough for the Government to prove that Dr. Rush had reason to know that the money was to be used for an illegal purpose; the Government was obliged to prove that he intended "to further, promote and cooperate" in the illegal venture. *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). The record demonstrates that the jury regarded this rather elusive distinction as a close question. Having commenced its deliberations at 2:30 P.M. on October 2, 1980, it reported less than two hours later that it was hung. Shortly after having been instructed to continue to deliberate, it requested the transcript of testimony given by Government witness Hall. The judge, having ascertained that a reading of the testimony would take about two hours, asked the jury whether it wished to hear Hall's entire testimony. After retiring to the jury room to deliberate briefly, the jury returned shortly after 5 P.M. to request a reading of the testimony of Government witnesses Myer and Hall concerning certain subjects which the jury specified. With respect to Hall, the jury asked to hear his testimony concerning "[w]hat he told Dr.

Rush as to what purpose the money he wished to borrow (or borrowed) would be put." The jury indicated its wish to adjourn and hear the testimony at 9:30 A.M. on October 3. This request was granted.

The judge, counsel and the court reporter then retired to the judge's chambers to identify the testimony requested by the jury. During the course of this review, the following question and answer from Hall's direct examination were read by the reporter:

> Q. Can you recall any specific conversation between you and Dr. Rush about what the money had been used for? [Objection omitted]
>
> A. Yes.
>
> Q. Will you tell the ladies and gentlemen of the jury what specific conversation you recall?
>
> A. That we had in fact made a successful run to the Bahamas and brought in a little bit, enough to pay him and pay off the shop, and so forth. You know. That kind of talk, back—you know. But there was no long, lengthy—and the reason I says I didn't know, because I don't remember exactly *whether* we said it, you know. [Emphasis supplied]

After the conference in chambers the prosecutor went back to her office to talk to a DEA agent about their recollection of the testimony and to look at her notes. They agreed between themselves that the word actually used by Hall to introduce the final clause of his answer was not "whether" but "when"—a version decidedly more favorable to the prosecution's case. The next morning she went privately to ask the court reporter to review his notes on this point. According to the account of their conversation that she later gave in court, he responded that he had already checked his notes and had discovered that he had erred the previous night in reading the word in question as "whether" rather than "when". Defense counsel was advised of the alleged mistake, and when the reporter read the testimony to the jury, he used the word "when".

After the reading, defense counsel sought an explanation of why the reporter had changed his interpretation of his notes. Following some off-the-record discussion the court ascertained that under the reporter's system the letters "WH" mean "when" and the letters "WHR" mean "whether". He asked the reporter what appeared in his notes, and the latter responded "when". In fact what appeared was "WHR" with the bottom part of the R almost entirely missing and the upper part much less strongly inked than in portions of the tape preceding or following the disputed symbol where R appeared alone or with other letters. What no one brought out, although this would have taken only a few seconds, is that the letters in question are so located on the keyboard that the reporter could have meant to type either "whether" or "when". The letters are arranged as follows:

H

W      R

The W is produced by a stroke of the middle finger of the left hand. The H, when typed without the R, is produced by a stroke of the index finger of the left hand. To type the H and R in one symbol such as "WHR", the reporter strikes both letters simultaneously with his index finger, the rows of keys being close enough together to permit his finger to bridge the gap between the two keys. The arrangement of the letters on the keyboard and the way in which they are supposed to be struck are seemingly consistent with two possibilities: One is that the reporter meant to strike only the H but that his index finger also caught the R; the other is that he meant to strike both the H and the R but that his single finger applied inadequate pressure to the R. The judge nevertheless announced that the reporter's statement was "dispositive of it, so far as I am concerned."

At 11:27 A.M. the court received a third note from the jury:

> Hall's testimony is becoming very crucial. Some of us seem to recall that in cross-examination he reversed himself and spicifically [sic] excluded Dr. Rush from the

group that knew the use to which the borrowed money was to be put.

We are willing to either listen to the entire testimony of Hall in cross-examination or listen to that portion which bears on the above point, whichever is more expeditious for all concerned.

A few minutes later the jury returned to the courtroom, and the reporter read Hall's entire cross-examination. When this reading was completed, the jury retired for further deliberations.

At this point defense counsel again called the judge's attention to the dispute concerning Hall's direct testimony. He recounted a conversation with the reporter in which the latter had admitted that he had no independent recollection whether "the word 'when' or 'whether' had been used at the time that that transcript had been taken". Defense counsel also indicated that he had personally examined the reporter's notes and that an R was clearly visible. He requested that the jury be instructed that there might be a discrepancy as to this portion of Hall's testimony. The judge disposed of this motion as follows:

> THE COURT: Mr. Russell, in the course of your duties you certify transcripts to be read on appeal and for other purposes?
>
> THE REPORTER: Yes, your Honor.
>
> THE COURT: And I know of that, of course, of my own knowledge. If you were certifying that transcript, and part of it was the interpretation in the course of your duties, of the symbol that appears that's been questioned by Mr. Franzblau [defense counsel], what would it be?
>
> THE REPORTER: "When."
>
> THE COURT: That's sufficient for my purposes. I decline to instruct the jury.[1]

Shortly thereafter the jury requested a reading of "the balance of Hall's testimony in full—the direct and redirect." The testimony was read, again with "when" rather than "whether". When defense counsel objected on this and other grounds, the judge adhered to his earlier ruling, noting that shortly after the disputed answer there was another where the same configuration of letters occurred but the context showed that the word clearly was "when". At 3:22 P.M. the jury returned a guilty verdict.

I see no sufficient reason for refusing to inform the jury that the reporter's notes did not clearly indicate whether Hall said "when" or "whether". The instruction requested by the defendant should have been given, with the judge adding, if so advised, that the reporter was convinced the word was "when" and that the jury should rely on its own recollection of the disputed testimony, much as jurors are typically instructed at the outset of their deliberations that their own recollections and not those offered by court or counsel should control. Putting aside the propriety of the prosecutor's approach to the reporter in the absence of defense counsel, I cannot accept the Government's argument (Brief, p. 17) that "there was no legitimate issue about the accuracy of the transcript as read to the jury and as certified on appeal in the transcript." In light of the reporter's admission that he had no independent recollection of the testimony, there would have been no legitimate issue only if "whether" made no sense in context or if there were evidence that the reporter was prone to making the error of lightly striking the R when he meant to strike only the H but that he rarely failed to apply adequate pressure to the R when he meant to strike both the R and the H. However, the "whether" makes sense, although not the sense the Government would like, and the only evidence on the reporter's habits was the single instance noted by the judge. The Government's version may have been somewhat more likely and advising the jury of the controversy would surely have made its task harder, but neither of these considerations afforded any justification for foreclosing it from con-

---

1. The judge apparently was relying, as does the majority, on the provision in 28 U.S.C. § 753(b) stating that "[t]he transcript in any case certified by the reporter shall be deemed prima facie a correct statement of the testimony taken and proceedings had." Clearly this does not render the reporter's certification conclusive or authorize the judge to withhold knowledge of a genuine controversy from the jury.

sidering the dispute. In saying this I by no means take the position that every challenge to the accuracy of a transcript need be brought to the jury's attention. Here we have the reporter's original reading of his notes as "whether" rather than "when", the possibility that his change was influenced by the prosecutor's *demarche*, the ambiguity of the notes themselves, the ease with which a mistake could have been made, the reporter's lack of personal recollection, the apparent absence of any recollection by the judge, and his failure to make even the slightest inquiry as to the cause of the error. Moreover, the dispute concerned testimony on the crucial issue of the case— an issue on which the jury was so deeply disturbed as to seek reading of the testimony on three occasions.[2] When we add to this that the judge's instructions on the elements of conspiracy, which the majority charitably calls "colloquial", were singularly uninformative and barely pass muster, I consider this verdict to be, in the language of the British Criminal Appeal Act, § 2, 1 Public General Acts and Measures of 1968 at 365, "unsafe and unsatisfactory". To use Lord Chief Justice Widgery's words, I am left with a "lurking doubt", *R. v. Cooper*, [1969] 1 Q.B. 267, whether Dr. Rush received the fair trial to which he was entitled. See also *Kotteakos v. United States, supra*, 328 U.S. at 764–65.

I would reverse for a new trial at which a better conspiracy charge would be given and there would be no doubt about Hall's testimony.

---

**2.** I cannot agree with my brothers that Hall's answer was not important because there was other evidence that Dr. Rush knew what the others were up to. As previously stated, the Government had to prove more than this. Moreover, Hall had admitted the fragility of his memory. It is still more impermissible to speculate that if Hall had said "whether", defense counsel would have pursued the issue further on cross-examination. In fact to do so would have been to make the common error of asking too much. I fear that my brothers have forgotten the admonitions in *Direct Sales* that the evidence of an intent to further "must be clear, not equivocal", 319 U.S. at 711, and in *Kotteakos v. United States*, 328 U.S. 750, 764 (1946), that whether error is harmless depends not on how it would have affected us but on what effect it "had or reasonably may be taken to have had upon the jury's decision." This was a seriously troubled jury and no testimony going to Dr. Rush's state of mind can be dismissed as unimportant.