UNITED STATES of America, Appellee,

v.

Robert MUNI, Defendant-Appellant.

No. 76, Docket 81–1167.

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1981.

Decided Dec. 11, 1981.

Charles Wender, Boca Raton, Fla. (Smith, Smith & Wender, Boca Raton, Fla., on the brief), for defendant-appellant.

Ruth A. Nordenbrook, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Jane Simkin Smith, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before NEWMAN and KEARSE, Circuit Judges and EGINTON,* District Judge.

NEWMAN, Circuit Judge:

Robert Muni was convicted in the District Court for the Eastern District of New York (Jack B. Weinstein, Chief Judge) of violating the wire fraud statute, 18 U.S.C. § 1343 (1976),[1] and knowingly and willfully using a counterfeit credit card to obtain money in an amount exceeding $1,000, 15 U.S.C. § 1644(a) (1976).[2] Muni appeals from the judgment of conviction of wire fraud on two grounds: that he did not transmit or cause to be transmitted any interstate communications, and that any interstate communications that occurred were not made for the purpose of executing the fraud. We reject appellant's contentions and affirm the judgment of the District Court.

Muni, as president of IBM Ladies Shoes and Boutique ("IBM Boutique"), located in Brooklyn, New York, executed a standard Merchant Agreement with Chemical Bank under which IBM Boutique was authorized to accept VISA and Master Charge cards in payment of purchases. The Merchant Agreement required Muni to obtain authorization for purchases in excess of applicable "floor limits" ($50 for a VISA card and $75 for a Master Charge card) by calling the Chemical Bank Authorization Center ("CBAC") in Lake Success, New York. The authorization clerk at CBAC would ask for the caller's merchant number, the number and expiration date of the credit card, and the amount of the sale. This information would be fed into Chemical Bank's computer to ascertain whether the credit card had been issued by Chemical Bank. If it had, the computer would scan its own files to determine whether the transaction should be approved or rejected; accepted transactions were given an authorization code, which the clerk would communicate orally to the merchant for recording on the sales slip. If the card had not been issued by Chemical Bank, the computer at CBAC would send an electronic inquiry over leased telephone lines to either the VISA facility at McLean, Virginia, or the Master Charge facility at St. Louis, Missouri. These facilities would initiate a scanning process by the bank that issued the card and, if the transaction was approved, an authorization code would be transmitted back over leased telephone lines to CBAC and communicated by the authorization clerk to the merchant. The entire authorization process would take from three to ten seconds. Appellant used counterfeit credit cards to charge 267 spurious purchases, totalling $95,455, at IBM Boutique and received credits in this amount to IBM Boutique's Chemical Bank checking account; Muni withdrew $90,000 before Chemical Bank discovered the fraud and froze the account. In making these charges, Muni regularly telephoned CBAC for an authorization code, and since the Chemical Bank computer determined that the cards identified by Muni had not been issued by Chemical Bank, electronic inquir-

---

* The Honorable Warren W. Eginton of the United States District Court for the District of Connecticut, sitting by designation.

1. Section 1343 provides:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Muni received concurrent three-year sentences on three of the wire fraud counts; on three other wire fraud counts and the counterfeit credit card count, he received consecutive three-year sentences, which were suspended, and he was placed on probation for five years with a condition of making restitution of $90,-000.

ies were transmitted to McLean, Virginia, and St. Louis, Missouri. These transmissions are alleged to constitute the interstate communications element of the wire fraud offense.

■ Appellant contends that his conviction should be reversed because he did not transmit or cause to be transmitted any interstate communications. While Muni personally did not make an interstate communication, he caused such a communication to be made. In *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Supreme Court articulated what is required for causation in the context of the mail fraud statute, 18 U.S.C. § 1341 (1976), which has been interpreted similarly to the wire fraud statute.[3] "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, *or where such use can reasonably be foreseen, even though not actually intended*, then he 'causes' the mails to be used." 347 U.S. at 9–10, 74 S.Ct. at 363 (emphasis added).

■ Appellant accepts the *Pereira* formulation, but contends that he neither knew nor reasonably could have foreseen that an interstate wire communication would be precipitated by his call to the local authorization center. The Government suggests that if Muni's act in fact caused the subsequent interstate communications from the local office to the computers in Virginia and Missouri, he is liable whether or not such results were reasonably foreseeable. This Court has expressed conflicting views on the requirement of foreseeability when a person is charged with causing an interstate communication. In *United States v. Houlihan*, 332 F.2d 8 (2d Cir.), *cert. denied*, 379 U.S. 828, 85 S.Ct. 56, 13 L.Ed.2d 37 (1964),

Judge Hays said the accused under § 1343 must either know that interstate facilities are used or foresee such use. *Id.* at 13. However, in *United States v. Blassingame*, 427 F.2d 329 (2d Cir. 1970), *cert. denied*, 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971), Judge Hays said the views expressed in *Houlihan* were erroneous. *Id.* at 331. The statements in both *Houlihan* and *Blassingame* are dicta with respect to whether foreseeability is an ingredient of criminal liability for causation of an offense, since in both cases the defendant had personally made the interstate communication. Where an interstate communication is made either by the defendant or by some other person for whose acts the defendant is liable either as a co-conspirator or an aider or abetter, the issue of responsibility for causing the communication does not arise. *Cf. United States v. Eisenberg*, 596 F.2d 522, 526 n.2 (2d Cir.), *cert. denied*, 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979). But it is squarely presented in this case where the interstate communication was made by the innocent third party at the local authorization center who received Muni's request for authorization.

■ When a person is to be held civilly or criminally responsible for causing an act, a mechanical chain-of-events test, applying "but for" reasoning, would unduly expand the scope of consequences for which he would be responsible.[4] Both the criminal and the civil law have circumscribed the range of consequences by considering an act to have been caused not simply when it was a physical consequence of the person's conduct but when, in addition, the actor either knew the consequence would occur or its

---

3. "Unfortunately, the legislative history of 18 U.S.C. § 1343 is sparse. Section 1343 is, however, included within the mail fraud chapter and does appear to be patterned after § 1341 ...." *United States v. Louderman*, 576 F.2d 1383, 1387 n.3 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978); *see United States v. Donahue*, 539 F.2d 1131, 1135 (8th Cir. 1976); *United States v. Calvert*, 523 F.2d 895, 903 (8th Cir. 1975), *cert. denied*,

424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976).

4. *See* F. Harper & F. James, *The Law of Torts* § 20.1, at 1108 (1956); *cf.* W. LaFave & A. Scott, *Handbook on Criminal Law* 252 ("The requirement of causation in criminal law, more often than not, serves not to free defendants from all liability but rather to limit their punishment consistent with accepted theories of punishment").

occurrence was reasonably foreseeable.[5] By invoking an objective test of reasonable foreseeability, the law avoids both a premium on ignorance and a vast range of liability for remote and unlikely physical consequences.[6]

The content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances. In this case, we think that the interstate communication by the authorization clerk at CBAC in Lake Success, New York, was reasonably foreseeable by Muni. The common knowledge that VISA and Master Charge cards are issued by banks throughout the country and that computers are used in the authorization process makes it reasonably foreseeable that when a defendant requests authorization with respect to a card not issued by a local bank, an interstate computer check is likely to follow.[7]

■ Appellant also argues that obtaining the authorization codes was not necessary to the fraudulent scheme and that the interstate communications were therefore not made for the purpose of executing the scheme, as is required by the statute. In *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), the Court held that the mailing of credit card charge slips for food and lodging, obtained by using a stolen credit card, was not for the purpose of executing the fraud because the fraud was complete when the defendant checked out of his motel. Muni seeks to bring himself within the scope of *Maze* by contending that the request for authoriza-

tion (and the consequent interstate communication) had nothing to do with the fraudulent scheme, since the request served only to assure the merchant that he would not be liable for any fraudulent transactions as to which he had secured authorization. We disagree. Here, unlike *Maze*, the interstate communications caused by Muni occurred before he sent the credit card charges to Chemical Bank and received credit to IBM Boutique's checking account. The securing of authorization, even if not absolutely required, was plainly a normal and customary part of the way a merchant processed charge transactions and obtained revenue. *See United States v. Huber*, 603 F.2d 387 (2d Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Furthermore, in light of the clause in the Merchant Agreement that "Merchant shall not use two or more Sales Slips to record a single transaction to avoid an authorization call," Muni's claim that authorization is for the merchant's benefit is disingenuous. Since the bank can refuse to pay for unauthorized purchases over the "floor limit," the presence of the authorization code at least gives the sales slip the appearance of legitimacy, in contrast to *Maze*, in which the mailing of the invoices "increased the probability that [the] respondent would be detected and apprehended." *United States v. Maze, supra*, 414 U.S. at 403, 94 S.Ct. at 650. Finally, it seems likely that the absence of authorization on a large number of transactions would have aroused the bank's suspicion; at least it is reasonable to assume that Muni feared that this would happen and there-

5. *See United States v. Scandifia*, 390 F.2d 244, 249 (2d Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297 (1969) (*per curiam*); *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, C.J.); F. Harper & F. James, *The Law of Torts* § 20.5, at 1135 (1956). *See also Wapnick v. United States*, 355 F.2d 136, 138 (2d Cir. 1966); *United States v. Weisman*, 83 F.2d 470, 473 (2d Cir.), *cert. denied*, 299 U.S. 560, 57 S.Ct. 22, 81 L.Ed. 412 (1936).

6. *Cf.* F. Harper & F. James, *supra*, § 20.4, at 1132 ("One consideration which is common to all cases under any system is the practical need

to draw the line somewhere so that liability will not crush those on whom it is put.").

7. Since it was reasonably foreseeable that the communication precipitated by Muni's call to the authorization center would occur and would be interstate, we need not consider in this case whether a defendant would be responsible for causing an interstate communication when it was reasonably foreseeable only that a communication, which was in fact interstate, would occur. *Cf. United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975) (substantive and conspiracy offenses concerning assaulting a federal officer do not require knowledge of victim's federal employment).

fore sought authorization to avoid any suspicion.

Affirmed. The mandate shall issue forthwith.