UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony De BIASI and John Mario Eboli, Defendants-Appellants.

Nos. 1383, 1384, Dockets 83–1074,
83–1075.

United States Court of Appeals,
Second Circuit.

Argued June 1, 1983.

Decided July 5, 1983.
Certiorari Denied Nov. 7, 1983.
See 104 S.Ct. 397.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., of counsel, for plaintiff-appellee.

Koopersmith, Feigenbaum & Potruch, Alexander Potruch, Lake Success, N.Y., for defendant-appellant De Biasi.

Marvyn M. Kornberg, Kew Gardens, N.Y., for defendant-appellant Eboli.

Before KAUFMAN, PRATT and GIBSON,* Circuit Judges.

FLOYD R. GIBSON, Circuit Judge:

John Eboli and Anthony De Biasi were convicted after a jury trial on one general count of conspiring to commit bank and wire fraud through the use of counterfeit credit cards. (18 U.S.C. §§ 371, 1014, 1343 (1976)). Defendant Eboli was also convicted on eighteen counts of conspiring to use counterfeit credit cards (15 U.S.C. § 1644(a)); and defendant De Biasi was convicted on two counts of wire fraud (18 U.S.C. § 1343). On appeal, Eboli challenges the propriety of the court's charge and the sufficiency of the evidence to support his conviction for conspiracy to use counterfeit credit cards under 15 U.S.C. § 1644(a). De Biasi makes similar challenges to his wire fraud convictions under 18 U.S.C. § 1343. Both defendants challenge the court's charge on the general conspiracy count and a variety of evidentiary rulings, and com-

* Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

plain of prosecutorial misconduct. Finally, Eboli attacks the court's failure to suppress evidence seized as a result of an allegedly illegal search and seizure. We reject all of these claims, finding most of them to be frivolous; hence, we affirm the judgments of convictions.

## I. Facts

The evidence presented at trial revealed that between 1980 and 1982 Eboli and De Biasi supplied coconspirator Peter Frappollo, a storekeeper, with numerous counterfeit credit card sales slips and counterfeit credit cards. Frappollo turned paid informant in 1981 after being confronted by postal inspectors regarding his fraudulent use of counterfeit credit card slips. Frappollo received immunity from prosecution and became the government's main witness at the trial of Eboli and De Biasi.

### A. Counterfeit Credit Card Sales Slips

In 1980, Frappollo, co-owner of the Vanilla Country Store, a retail establishment in Rocky Point, New York, was party to a Merchant's Agreement with Chemical Bank under which Frappollo was authorized to accept VISA and MasterCard cards in payment of purchases at the store. Seizing upon this relationship with Chemical Bank, Frappollo entered into a scheme with his friend John Verrastro, involving counterfeit credit card sales slips. Frappollo would give blank credit card sales slips to Verrastro, who would turn the slips over to a supplier and for $60 per slip acquire slips imprinted with a card number, cardholder name and cardholder signature. Verrastro would return the imprinted slips to Frappollo, who would fill in purchase amounts,

telephone for and receive authorization from Chemical Bank, deposit the slips in his account, and then withdraw the funds and split the proceeds with Verrastro.

Verrastro told Frappollo that Eboli was the supplier of the imprinted slips. Frappollo also received slips directly from Eboli. Frappollo testified that on one occasion he met Eboli at a candy store and gave him blank slips. Eboli handed the slips to De Biasi who went to the back of the store and returned fifteen minutes later with ten slips imprinted with a customer number, name, and signature.

Frappollo continued making fraudulent deposits of the imprinted slips supplied by Verrastro, Eboli and De Biasi until December 1980, when Chemical Bank closed the Vanilla Country Store account. Expert testimony established that these slips were imprinted with counterfeit cards. None of the true cardholders whose card number, name, and signature on the counterfeit slips identified in the eight wire fraud counts had ever purchased anything from Vanilla Country Store or had authorized anyone to sign his signature on a sales slip. Five of the customer signatures appearing on the counterfeit slips deposited by Frappollo were positively identified as having been written by Eboli and four by De Biasi.

Two of the slips written by De Biasi formed the basis for his conviction on two wire fraud counts. With respect to these two slips, Frappollo testified that he telephoned the Chemical Bank Authorization Center ("CBAC") in Lake Success, New York, and received authorization for MasterCard purchases in excess of the applicable "floor limit" of $50.[1] CBAC authorization

---

1. The Merchant Agreement between Vanilla Country Store and Chemical Bank required Frappollo to obtain authorization for purchases in excess of applicable "floor limits" ($50 for a VISA card and $75 for a MasterCard card) by calling the Chemical Bank Authorization Center ("CBAC") in Lake Success, New York. The authorization clerk at CBAC would ask for the caller's merchant number, the number and expiration date of the credit card, and the amount of the sale. This information would be fed into Chemical Bank's computer to ascertain whether the credit card had been issued by Chemical

Bank. If it had, the computer would scan its own files to determine whether the transaction should be accepted or rejected; accepted transactions were given an authorization code, which the clerk would communicate orally to the merchant for recording on the sales slip. If the card had not been issued by Chemical Bank, the computer at CBAC would send electronic inquiry over leased telephone lines to either the VISA facilities at McLean, Virginia, or San Mateo, California, or the MasterCard facility at St. Louis, Missouri. These facilities would initiate a scanning process by the bank

logs confirmed that a CBAC clerk received electronic authorization for the sales slips from the MasterCard facility in St. Louis, Missouri. This authorization was made over leased telephone lines connecting CBAC in New York and the MasterCard facility in St. Louis, Missouri.

## B. *Counterfeit Credit Cards*

In February, 1982, Frappollo, cooperating with Postal Office inspectors, renewed his contacts with Verrastro in an effort to obtain counterfeit credit cards. On five separate occasions between February 23 and the arrests of Verrastro and Eboli on May 7, 1982, Verrastro sold Frappollo counterfeit cards; in all Verrastro sold Frappollo over fifty counterfeit cards. Evidence proving Eboli supplied Verrastro with the cards on at least four of these occasions was demonstrated through an interweave of tape recordings of conversations between Frappollo and Verrastro, telephone company records of calls made between Verrastro's and Eboli's homes, surveillance, and fingerprint evidence showing Eboli's right thumb and right index fingerprints appeared on a white piece of paper containing ten counterfeit cards.

The final counterfeit credit card sale on May 7, 1982, was preceded by three conversations between Frappollo and Verrastro discussing purchasing arrangements, and three calls from Verrastro's home to Eboli's home. On May 7, Frappollo, under postal inspector's supervision, arrived at Verrastro's home with eighteen marked $100 bills. Verrastro delivered twenty counterfeit cards to Frappollo in exchange for $1,500. Verrastro told Frappollo that he would transfer the money to his source and instructed Frappollo to return with the remainder of the purchase price of $1,700.

Later, surveillance officers observed Verrastro meeting Eboli. After Verrastro and Eboli parted company, the officers arrested Eboli. A subsequent search revealed nine of the marked $100 bills Frappollo had earlier given to Verrastro and a counterfeit Chemical Bank MasterCard. This credit card was compared with the others Frappollo had received from Verrastro that day and it was determined that they were all made by the same counterfeit plate.

## C. *The Defense*

Eboli's defense basically consisted of his own testimony that although he both received the phone calls from Verrastro reflected in the telephone records and met Verrastro each of the times he had been observed by surveillance officers, he was merely "settling up" gambling debts that Verrastro owed him. During sentencing, the trial judge concluded that Eboli's testimony was perjurious. De Biasi called one witness, a sales manager who sold De Biasi a green Cadillac that had a green roof. This evidence was introduced to negate the inference that Verrastro had entered De Biasi's Cadillac on March 30 to obtain the counterfeit credit cards since the surveilling officer who had observed that transaction testified the Cadillac Verrastro entered had a black vinyl top.

## II. *15 U.S.C. § 1644(a): Fraudulent Use of Credit Cards*

Recognizing the overwhelming evidence showing that he knowingly conspired to supply counterfeit credit cards to obtain money, defendant Eboli contends that the evidence failed to show and the trial count failed to charge, pursuant to 15 U.S.C. § 1644(a)[2] that he knew or should have

---

that issued the card and, if the transaction was approved, an authorization code would be transmitted back over leased telephone lines to CBAC and communicated by the authorization clerk to the merchant. The merchant would place the authorization code number on the credit sales invoice. The sales slips would then be deposited in the merchant's account and would be treated as a cash deposit available for immediate withdrawal. A permanent record of all credit card related inquiries and their results

is maintained in the form of daily authorization logs at both the CBAC and at the MasterCard facility at St. Louis.

**2.** 15 U.S.C. § 1644 provides, in pertinent part:

(a) Whoever knowingly in a transaction affecting interstate or foreign commerce, uses or attempts or conspires to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain

known that each counterfeit credit card had a credit limit in excess of $1,000 and that he specifically intended that each card be used to obtain more than $1,000 in a single transaction affecting interstate commerce.

■ We reject this contention and conclude that the interstate commerce and the $1,000 monetary threshold elements of § 1644(a) are solely jurisdictional and need not be in the mind of a defendant, such as Eboli, who knowingly joins a conspiracy which envisioned the maximum use of each counterfeit credit card, where each counterfeit card could in fact be used to obtain over $1,000 in goods and services and would necessarily affect interstate commerce. *Cf. United States v. Feola,* 420 U.S. 671, 684–85, 696, 95 S.Ct. 1255, 1263–64, 1269, 43 L.Ed.2d 541 (1975) (knowledge of purely jurisdictional facts required for neither substantive offense of assaulting a federal officer nor conspiracy to commit the substantive offense). It is the agreement that particular cards whose credit limit exceeds $1,000 would ultimately be used in transactions affecting interstate commerce to obtain as much money as possible by the merchant purchaser, standing alone, that gives rise to a sufficient threat to interstate transactions as to trigger federal jurisdiction. The defendant's intent and knowledge with respect to the interstate commerce and $1,000 monetary requirements are simply irrelevant to whether such federal jurisdiction exists. As the Court expressed in *Feola:* "The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *Id.* at 685, 95 S.Ct. at 1264.

We can find nothing in text of § 1644(a), its purpose or its scant legislative history indicating that the interstate commerce and $1,000 monetary threshold elements serve other than a jurisdictional basis function. Other courts, interpreting statutes containing language similar to that contained in § 1644(a), have held that the interstate commerce element is purely jurisdictional and thus does not require that the defendant either intend or know that interstate commerce will be affected. *United States v. Squires,* 581 F.2d 408, 409–10 (4th Cir. 1978) (National Stolen Property Act, 18 U.S.C. § 2314); *United States v. Newson,* 531 F.2d 979, 981 (10th Cir.1976) (interstate transportation of forged securities); *United States v. Muncy,* 526 F.2d 1261, 1264 (5th Cir.1974) (interstate transportation of stolen goods).

Moreover, we are mindful that the obvious Congressional purpose behind 15 U.S.C. § 1644(a) was to provide consumers and businesses with additional protection from the staggering losses occasioned by the fraudulent use of credit cards. *See United States v. Lomax,* 598 F.2d 582, 583–84 (10th Cir.1979).[3] Although the interstate commerce requirement is obviously necessary in order to assert federal jurisdiction, we agree with the court's conclusion in *Lomax* that Congress intended to use its broadest constitutional powers to punish fraudulent credit card uses affecting interstate commerce. *Id.* at 584.

Given this purpose, it is also reasonable to assume that Congress imposed the monetary limit to protect the federal justice system from becoming inundated with prosecutions of frauds involving small amounts of money, frauds which could be readily

---

money, goods, services, or anything else of value which within any one-year period has a value aggregating $1,000 or more ...

. . . . .

(f) ... shall be fined not more than $10,-000 or imprisoned not more than 10 years, or both.

**3.** In his dissent in *United States v. Maze,* 414 U.S. 395, 416, 94 S.Ct. 645, 656, 38 L.Ed.2d 603 (1974), Justice White referred to the extent of credit card losses in the United States:

In this era of the "cashless" society, Americans are increasingly resorting to the use of credit cards in their day-to-day consumer purchases. Today well over 300 million credit cards are in circulation, and annual charges exceed $60 billion. In 1969 alone, 1.5 million credit cards were lost or stolen, resulting in fraud losses exceeding $100 million. 115 Cong.Rec. 38987 (1969). Current estimates of annual credit card fraud losses are put as high as $200 million.

handled by state courts.[4] Also, a similarly worded monetary threshold requirement contained in the National Stolen Property Act (18 U.S.C. § 2314) has been viewed as purely jurisdictional. *See United States v. Roselli,* 432 F.2d 879, 892 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971).

We therefore cannot agree with Eboli that the $1,000 monetary threshold in § 1644(a) was designed to impose the additional *scienter* requirement that the defendant know that the counterfeit credit cards could be used to acquire at least $1,000. In any event, Eboli has no cause to complain in this case because the district judge instructed the jury that it had to find Eboli knew the cards had a credit limit in excess of $1,000 and could be used to acquire at least $1,000 worth of goods or services. And, clearly there was sufficient evidence to support a finding that Eboli knew that the cards he sold could be used to obtain over $1,000 in goods or services.

### III. *18 U.S.C. § 1343: Wire Fraud*

■ De Biasi challenges the sufficiency of the evidence to support his convictions on the two counts of wire fraud under 18 U.S.C. § 1343. He first claims that with respect to the two sales slips forming the basis for these two counts, there were no interstate communications and the authorization calls Frappollo made to CBAC were local New York calls.

This contention is meritless. Frappollo testified that for each counterfeit slip he received from Verrastro, Eboli, and De Biasi, he made an authorization call to the CBAC in Lake Success, New York. This in turn resulted in an interstate authorization communication between a CBAC clerk in Lake Success, New York, and the MasterCard facility in St. Louis, Missouri. The MasterCard records showed that on October 26, 1980, and on November 16, 1980, a Chemical Bank merchant had requested and received authorization from the Eastern

State Bank Card Association for the purchase reflected on the two slips in question. The CBAC authorization logs also revealed that authorization was received from St. Louis for these two slips. While the CBAC authorization logs did not indicate the particular merchant who requested authorization, the authorization approval codes, cardholder numbers, and amounts of purchase appearing on the logs corresponded to the numbers on the two slips, leading the Chemical Bank National Account Director to reasonably conclude that interstate authorization was received for the purported purchases reflected by the two slips.

■ De Biasi alternatively claims that neither Frappollo's authorization call nor the resultant interstate authorization request was reasonably foreseeable and that obtaining the interstate authorization was not necessary to the fraudulent scheme.

In *United States v. Muni,* 668 F.2d 87, 89–90 (2d Cir.1981), a case involving the application of the wire fraud statute to a fraudulent credit card scheme where the interstate communication was made by an innocent third party at the local authorization center who received defendant's request for authorization, defendant's responsibility for "causing" the interstate communication required a finding that he reasonably foresaw the interstate communication. In finding that the interstate communication was reasonably foreseeable by the defendant Muni, the court reasoned:

The content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances. In this case, we think that the interstate communication by the authorization clerk at CBAC in Lake Success, New York, was reasonably foreseeable by Muni. The common knowledge that VISA and Master Charge cards are issued by banks throughout the country and that computers are used in the authorization process makes it reason-

---

4. In 1974, § 1644 was rewritten for the purpose of liberalizing federal assistance to cope with the rapidly expanding credit card frauds. Accordingly, the total value of property received to constitute a violation was reduced from $5,000 to $1,000, and the imprisonment period increased to ten years.

ably foreseeable that when a defendant requests authorization with respect to a card not issued by a local bank, an interstate computer check is likely to follow. *Id.* at 90.

While De Biasi was one step farther away from the interstate communication than was the defendant in *Muni,* the evidence here was sufficient to support the jury's finding that he reasonably could have foreseen that an authorization call would be made by Frappollo which, in turn, would result in an interstate wire communication. Since Frappollo bought the slips for $60 a piece, common sense dictates that Frappollo would use the slips for bogus purchases considerably in excess of $60. And while the precise floor limits requiring authorization may not be widely known, it is common knowledge that authorization is required for large purchases. Furthermore, Frappollo testified that when he could not get authorization, he would return the slip and get another slip in return. The jury could certainly infer from this chain of events that De Biasi could reasonably foresee the authorization call and its central role in the fraudulent scheme. *Id.* at 90–91. Finally, like the defendant in *Muni,* once De Biasi became aware that authorization calls were being made, he was charged with the common knowledge that the authorization process entailed an interstate computer check. *Id.* at 90.

## IV. *18 U.S.C. § 1014: Conspiracy to Commit Bank Fraud*

■ The defendants urge two separate grounds for the reversal of their convictions for conspiracy to commit bank and wire fraud. First, they claim for the first time on appeal that they could not be convicted of conspiracy to commit bank fraud under 18 U.S.C. § 1014 [5] because the merchant depositor, in this case Frappollo, remains

liable for the advances under his Merchant Agreement and thus the fraudulent scheme did not subject the bank to a risk of loss.

This contention is not well taken. Frappollo's possible civil liability for thousands of dollars advanced by Chemical Bank hardly protects Chemical Bank from a risk of loss [6] or precludes a finding that the schemers intended that false statements be made for the purpose of influencing the action of the bank upon the advance of funds to the merchant.

Second, defendants contend the court erred in its charge on the conspiracy count by failing to charge: (1) that the defendant must have adopted the plan of the conspiracy as his own so that he ultimately had a stake in its outcome; (2) the defendant must have reasonably foreseen that an interstate telephone communication would be used in furtherance of the conspiracy; and (3) the accused intended to influence a bank's decision to loan funds.

■ Defendants' failure to raise objections to the adequacy of the conspiracy charges given by the trial court precludes them from raising any objection now. Nevertheless, defendants' claims are meritless. The trial court is not required to use "stake in the interest test" language in a conspiracy instruction. *United States v. Rush,* 666 F.2d 10, 12 (2d Cir.1981). All that is required is that the jury be instructed that, in order to convict, it must find the defendants intended to further or to promote the illicit scheme. *Id.* The trial court clearly did this when it instructed:

What the government must prove beyond a reasonable doubt, in order to bring the accused into the conspiracy, is that the accused knew the purpose and object of the conspiracy, and knowing that, willful-

---

**5.** 18 U.S.C. § 1014 makes it a crime to: "knowingly mak[e] any false statement or report, or willfully overvalu[e] any land, property or security, for the purpose of influencing in any way the action of [certain enumerated financial institutions, among them banks whose deposits are insured by the Federal Deposit Insurance Corporation], upon any application, advance, discount, purchase

agreement, repurchase agreement, commitment or loan...."

**6.** As the Chemical Bank Director of National Accounts testified, even though the merchant must legally indemnify the bank for all unqualified slips, if there is no money in the merchant account, the bank must bear the loss.

ly participated in the conspiracy— help[ed] further the business of the conspiracy, that he did it deliberately, intentionally, not inadvertently, negligently, innocently, but willfully.

■ Further, the court's charge adequately and comprehensively included all the necessary elements of a conspiracy: the agreement, common objective, acts in furtherance of the objective, and knowledge. Specifically, pursuant to defendants' request, the court charged that to convict defendants, the jury must find that the defendants willfully entered the conspiracy aware that the purpose and object of the conspiracy was "to make false statements and to overvalue property *for the purpose of influencing the actions of banks* insured by the Federal Deposit Insurance Corporation upon the purchase of VISA and Master Charge sales debts" and "to manufacture and distribute counterfeit credit card sales slips as part of a *scheme to defraud banks involving interstate wire communications or transmissions.*" (Emphasis added). The court then went on in painstaking detail to articulate the conspiracy in which the defendants were charged with having knowingly entered. Although the jury was not instructed that guilt required findings that defendants specifically intended to influence a bank's decision to loan funds and reasonably foresaw the use of an interstate telephone communication to effectuate the fraud, the trial judge did charge that each defendant must have willfully entered and participated in the conspiracy aware that: (1) its object was to influence the action of banks through the making of false statements (the deposit of false and fraudulent credit card sales slips); and (2) the fraud would be carried out, in part, by the authorization request over interstate lines. We therefore conclude that the conspiracy charge was proper.

## V. *Evidentiary Rulings*

■ Defendants raise a host of other challenges to evidentiary rulings. First, Eboli claims the court erred in admitting a surveillance photograph of Eboli that the postal inspector had made reference to during his testimony. The photograph was admitted for the limited purpose of eliminating any inference that the photograph was a "mug shot." Eboli now contends that he was prejudiced by the unexplained origin of the photo because the jury must have inferred that he was under investigation for unrelated criminal activities.

We believe Eboli's claim of prejudice here is sheer speculation. In any event, Eboli has no cause to claim prejudice because his own counsel, in an attempt to impeach the postal inspector's credibility, elicited testimony from the postal inspector that Eboli was already known to postal inspectors at the start of the investigation.

[9] Second, De Biasi claims the court erred in admitting a July 14, 1982 record from the New York State Department of Motor Vehicles which indicated that Prudential Insurance Company began insuring a 1979 green Cadillac registered to defendant De Biasi on December 29, 1980, and that the car was re-registered on November 20, 1981. The registration expired on November 20, 1982, and as of July 14, 1982, there was no indication that De Biasi had sold the car. This record was admitted in connection with surveillance officers' testimony that Verrastro obtained counterfeit cards from the occupants of a green Cadillac on March 30, 1982. De Biasi claims that the registration record was not probative because it did not reflect that he was the owner of the car on March 30, 1982.

We conclude that the admission of the registration document was proper. From the absence of any record as of July 14 showing a sale of the car, the jury could reasonably infer that De Biasi owned the car on March 30, 1982. Furthermore, given other evidence connecting De Biasi to the sale of counterfeit credit cards, the allegedly "tenuous" connection between the green Cadillac observed on March 30, 1982, and De Biasi really went to the weight that the jury should have given to the registration record, not to its admissibility.

■ Third, Eboli contends that the telephone computer print-out records of calls made between Verrastro's home and Eboli's home were inadmissible because they contained only the month and date of each call, and not the year. He suggests that without the year being specified on the print-outs, one cannot be certain when the calls were made, and, thus, the records were irrelevant.

Again, Eboli's claim here really goes to the weight, not the admissibility of the print-out records. Moreover, the suggestion that these records may have reflected phone calls in a year other than 1982 is belied by Eboli's witness stand admission that each of the calls was in fact made in 1982 and the coincidence between the date of the phone call records and the date of the counterfeit credit card transactions. Eboli's claim that the records were prejudicial to his defense is correct insofar as it goes. However, the records were prejudicial to his defense because they were extremely probative, not because they were improperly admitted or unfairly used.

■ Fourth, Defendants urge that the trial judge abused his discretion under Fed. R.Evid. 702 when he permitted (1) the fingerprint analyst to give his opinion, based upon the portion of Eboli's thumb and index finger leaving prints on the white paper containing the counterfeit cards delivered on February 23, that Eboli touched the paper when it was folded and could not have left such prints had he touched the paper when it was flat, and (2) the Chemical Bank credit card production supervisor to give her opinion, based upon her familiarity with the printing used by Chemical Bank and the disparity between the numbers used by Chemical Bank and those appearing on a variety of credit card slips deposited by Frappollo, that these slips were imprinted with counterfeit cards.

We view both of these rulings as proper exercises of the trial court's discretion. The opinions of both experts were based entirely upon their areas of special knowledge, were of assistance to the trier of fact, and did not confuse the jury. Also, the jury was prop-erly charged that the experts' testimony was not binding upon them and that they were the ultimate judge of its worth.

Finally, defendants claim that the court erred in failing to strike Frappollo's testimony that the government agreed to "protect him" if he cooperated. Frappollo immediately explained that by "protect him" he meant that he would receive immunity from prosecutions concerning his involvement in the credit card scheme. Nevertheless, Eboli's counsel moved for a mistrial, claiming the jury could infer that Frappollo was being protected from Eboli and De Biasi. Although denying the mistrial motion because Frappollo clearly indicated that he meant protection against prosecution, the trial judge nevertheless was willing to accept De Biasi's counsel's request that he admonish the jury to strike the "protect me" statement. However, after Eboli's counsel protested that such an admonition would only accentuate the statement, De Biasi's counsel withdrew the motion to strike.

■ In view of the withdrawal of the motion to strike and the failure to seek a curative instruction, defendants' complaint is not cognizable on appeal. Furthermore, we do not believe the court erred in denying the mistrial motion because of Frappollo's statement; the statement here was ambiguous at best, making no reference to any threats made by defendants.

## VI. *Prosecutorial Closing Statements*

■ The numerous prosecutorial statements defendants complain of were either entirely proper or rendered innocuous by the trial judge's curative instructions. First, although the prosecutor stated that "a reasonable doubt is one for which a reason exists," the court immediately corrected her and told the jury that he would define reasonable doubt.

■ Furthermore, considering that Eboli was acquitted of all the wire fraud counts and that De Biasi was only convicted on those counts related to sales slips on which his handwriting was positively identified,

we dismiss as frivolous the claim that defendants were harmed by the prosecutor's erroneous, but immediately corrected statements that Eboli "probably"—instead of "possibly"—signed two additional slips and that De Biasi signed three instead of four slips.

Similarly unfounded is De Biasi's claim that he was prejudiced by the prosecutor's reference to Frappollo's 1981 report that he received counterfeit slips from both Eboli and De Biasi. The court immediately cautioned the jury that the report did not indicate that Frappollo had implicated De Biasi in 1981. More important, however, De Biasi's conviction only on the two wire fraud counts for which there was positive handwriting evidence demonstrates that the jury was not swayed by any misstatements as to the 1981 report.

Finally, we reject defendant's claim that the prosecutor improperly vouched for Frappollo's credibility by pointing out that Frappollo's immunity agreement did not protect him against a perjury prosecution. *See United States v. Ricco,* 549 F.2d 264, 274 (2d Cir.), *cert. denied, sub. nom. Indiviglia v. United States,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977).

### VII. *Probable Cause to Arrest Eboli*

Eboli claims the postal inspector's surveillance officers did not have probable cause to arrest him for his involvement in the fraudulent credit card conspiracy. He suggests that the legitimacy of his arrest depends upon a finding that the officers had probable cause to believe he was carrying counterfeit credit cards at the time of his arrest. He also makes the novel suggestion that the officers should have gotten an arrest warrant as soon as Eboli's fingerprints were discovered on the February 23, 1982 packet of counterfeit cards.

First, probable cause to arrest Eboli was clearly established by: (1) Frappollo's implication of Eboli as the supplier of sales slips in 1980, (2) surveillance of Eboli with Verrastro on three of the five occasions that Verrastro delivered counter-

feit cards to Frappollo in 1982, (3) Eboli's fingerprints on the packet of cards delivered on February 23, 1982, (4) reference to Eboli in conversations between Verrastro and Frappollo as the supplier of the counterfeit cards and (5) records of phone calls between Verrastro and Eboli on the dates the sales were arranged. Second, there is no support for Eboli's novel suggestion that he was constitutionally entitled to an arrest the moment there was probable cause to arrest. *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966); *United States v. Waltzer,* 682 F.2d 370, 373 (2d Cir.1982). The postal inspectors were under no constitutional duty to call a halt to the investigation and arrest Eboli the moment they received confirmation through the fingerprint evidence that Eboli was involved in the conspiracy. So long as probable cause as to his participation existed at time of the arrest, there can be no objection to its timing and no requirement that the arresting officers have probable cause to believe that a search incident to the arrest would reveal fruits of a crime.

Judgments affirmed.